————o————

SANGUINET H. BENOIST, et al., Appellants, vs. JAMES MURRIN, et al., Respondents.

1. *Wills, contest concerning—Burden of proof—Right to open and close case.*—When the validity of a will is contested, and the defendants are endeavoring to establish a hold under the will, they have the affirmation of the issue to be tried, and the burden of proof remains with them throughout the trial.—They are thereupon entitled to the opening and conclusion.

2. *Wills—Disposing mind and memory defined.*—A disposing mind and memory may be said to be one which is capable of presenting to the testator all of his property and all the persons who come reasonably within the range of his bounty; and if a person has sufficient understanding and intelligence to understand his ordinary business, and to understand what disposition he is making of his property, then he has sufficient capacity to make a will.

| 58 | 307 |
| 98 | 439 |
| 58 | 307 |
| 37a | 173 |
| 58 | 307 |
| 110 | 461 |
| 58 | 307 |
| 113 | 255 |
| 117 | 102 |
| 58 | 307 |
| 129 | 538 |
| 58 | 307 |
| 144 | 363 |
| 58 | 307 |
| 145 | 442 |
| 58 | 307 |
| 153 | 232 |
| 153 | 288 |
| 58 | 307 |
| 160 | 579 |
| 58 | 307 |
| 172 | 701 |
| 173 | 72 |

3. *Wills—Capacity of testator—Insanity.*—Whenever a person imagines something extravagant to exist which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that respect insane; and if his delirium relates to his property, he is then incapable of making a will. But to invalidate the instrument it must be directly produced by the partial insanity or monomania under which the testator was laboring.

4. *Wills—Contests touching—Province of jury—Instructions.*—In contests touching a will, it is the province of the jury to determine simply whether or not the will is a valid instrument. It is not one of their functions to make an equal distribution of the property or determine whether ample provision had been made for all persons reasonably to be presumed to come within the range of the testator's bounty, and instructions which direct their attention to such questions are erroneous.

### *Appeal from St. Louis Circuit Court.*

*Trusten Polk,* for Appellants.

I. The court erred in refusing the third instruction prayed by plaintiffs. This instruction in effect asserted several propositions of law, which are correct.

*a.* The first proposition is, that a sound and disposing mind and memory are necessary to testamentary capacity. This proposition, I take it, is too plain for argument or authority. It is the universal assertion of all the authors and of all the courts.

*b.* The second proposition of the instruction is a definition of the word "sound," as required in the mind of the testator, to constitute him capable of making a will. It asserts that "sound signifies whole, unbroken, unimpaired, unshattered by disease or otherwise." This is the very definition of the word given by the court in *ipsissimis verbis,* in the case of Den vs. Johnson, (2 Southard, 454).

*c.* The third proposition of the instruction contains a definition of the word "disposing," as a requisite to testamentary capacity in the mind of a testator to make him competent to make a will.

1. It asserts, first, that a "disposing mind and memory is a mind and memory capable of recollecting all the testator's property and its amount, condition and situation." (Redf. Wills, 123–4, § 5; 126, § 9; Converse vs. Converse, 21 Vt.,

170 ; Hindon vs. Kerry, 14 Bur. Eccl. Law, 85, 88 [cited in Redf. Wills, 97, n. 3]; Harwood vs. Baker, 3 Moore's Priv. Coun. Cases, 282; Daniel vs. Daniel, 39 Penn. St., 207–8; Den vs. Johnson, 2 South., 454 ; Clark vs. Fisher, 1 Paige, 173.)

2. The third proposition asserts, secondly, that the testator's mind must be capable of estimating his property and dividing it out, and of comprehending the scope and bearing of the provisions of the will. (The Parish Will Case, 23 N. Y., 29.)

3. The third proposition asserts, thirdly, that the testator must have a mind capable " of discussing and feeling the relations, connections and obligations of family and blood." (Den vs. Johnson, 2 South, 454; Redf. Wills, 534, § 47, and cases cited.)

4. "And of recollecting all the persons who come reasonably within the range of his bounty. (Redf. Wills, 123–4, § 5.)

5. " And also all that he had previously done for any and each of them." (Redf. Wills, 126, § 9.)

6. " And also the number, condition and circumstances of those who are the proper objects of his bounty, and also of weighing their deserts, with respect to conduct, capacity and need, remembering all and forgetting none." (Redf. Wills, 125–6, § 9 ; Clark vs. Fisher, 1 Paige, 171; Hinson vs. Kersey, *ubi supra;* Beck's Med. Jurisp., 860; Parish Will Case, 25 N. Y., 29; McClintock vs. Curd, 32 Mo., 40; Harrison vs. Rowan, 3 Wash, C. C., 585 ; St. Legu Will Case, 34 Conn., 434; Gen. Stat., 1865, 528, § 9.)

II. The court below committed error in refusing the second instruction prayed by plaintiffs. That instruction asked the court to declare, that if the jury should find, that, at the time S. A. Benoist executed the instrument propounded as his will, he was possessed of false and exaggerated opinions, of which he could not divest himself, of the several matters of fact therein enumerated, and that these caused and determined the disposition of his property contained in the instru-

ment, then the jury ought to find that said instrument was signed by him under a delusion and mistake, and that it was not his will. . The proposition of law asserted in this instruction is sound. (Waring vs. Waring, 6 Moore's Priv. Coun. Cases, 349 ; Stanton vs. Weatherox, 16 Barb., 259.)

But the court gave another instruction embodying hypothetically the very same matters of fact contained in this second instruction of plaintiff, and in it told the jury, that if these false opinions solely caused and determined the dispositions of his property contained in the instrument purporting to be the will of Benoist, then the jury ought to find that said instrument was signed by him under a delusion and mistake, and that it was not his will. The court committed an error in putting the word "solely" in the instruction.

III. The errors hereinbefore complained of, are not obviated by the instructions given by the court, on its own motion, as has been already shown, nor by any given upon the motion of the defendants.

*S. Knox*, for Appellants.

I. The first and second instructions given by the court were not the instructions asked by plaintiffs, but the plaintiffs' instructions modified by the court. The third instruction given on a motion of defendants, as to what constitutes testamentary capacity, is erroneous. A man may be a monomaniac, or be under a delusion which influenced the provision in the will, and still possess the testamentary capacity prescribed in this instruction. (1 Barb., 259 ; 1 Redf. Wills, 86,7,8,9, 122–3, 125.) The written offer of plaintiffs filed in this case, entitled the plaintiffs to the opening and conclusion of the case. The court refused to allow the plaintiffs this right.

*E. C. Casselberry*, for Appellants.

I. If a will is not the act or product of the mind, it is no will. It is only the mechanical act of the hand in executing the instrument. (See the following definitions of a will : Jarm., Wills, vol. 1, p. 1, and authorities cited ; Bouv. Law. Dict., vol. 2, p. 665 ; Bacon's Abridg., vol. 8, p. 433, letter "A;"

Cooper's Justinian, 112; Moreau & Carleton's Partidas, vol. 2, p. 961.)

II. A will is the serious and deliberate act of the mind, built upon reason and judgment, after a full examination of the whole subject, and all of the facts and circumstances con-nected therewith. Any instrument of writing falling short of this, no matter how formally the same may be drawn and attested, is not in law a will. No matter how sound a per-son's mind may be, if, from misconception, mistake, over-sight, forgetfulness, or other cause, the instrument is not the act or product of his mind, it is not in law his will. Many things a person of perfectly sound mind does by or through misconception, mistake, oversight, forgetfulness, or other cause, which could not, with any degree of seriousness, be considered the act or product of the mind. A person may be perfectly sane on all subjects save one, and be perfectly in-sane on that one subject, and no one would be aware of his partial insanity, except those who might happen to converse with him on the subject on which he is insane.

As to the effect of delusion on mental soundness for testa-mentary purposes, see Tayl. Med. Jur., p. 626; Redf. Wills, 71–76; 1 Jarm. Wills, 58–79; Shelf. Lunacy, 296; Patterson vs. Patterson, 6 S. & R., 56; Seaman's Friend Society vs. Koffer, 33 N. Y., 619; Harrell vs. Harrell, 1 Duvall, 203.

As to the effect of partial insanity, see Cooper's Justinian, 146; Kevil vs. Kevil, 2 Bush, 614; Harrell vs. Harrell, 1 Du-vall, 203; Gamble vs. Gamble, 29 Barb., 373; Jarm. Wills, vol. 1, pp. 79, 80; 2 Stark. Ev., (5 Am. Ed.) 392; Shelf. Lunacy, 279, 280; Thompkins vs. Thompkins, 1 Baily, 92; Groves vs. Grant, 2 Green Ch., 620, 635, 636; Couch vs. Couch, 7 Ala., 519; Dean vs. Littlefield, 1 Pick., 243; Hall vs. Warren, 9 Ves., 610; Clark vs. Lear cited, 1 Pill., 119; Davis vs. Cal-vert, 5 Gill. & Johns., 269, 301; Beaubien vs. Cicotte, 12 Mich., 459; Redf. Wills, Ch. 10, § 55, p. 537, vol. 1, 2nd. Ed.

As to the mental capacity required, see 1 Redf. Wills, 121, 122, 125, 128; Den vs. Johnson, 2 South., 454; Boyd vs. Eby, 8 Watts., 66; Clark vs. Fisher, 1 Paige, 171; 3 Sandf., 351; 2 Conn., 498.

III. Where the will is unreasonable in its provisions, and inconsistent with the duties of the testator, with reference to his property and family, or what the Civilians denominated an inofficious testament, this of itself will impose upon those claiming under the instrument, the necessity of giving some reasonable explanation of the mental character of the will, or at least of obliquity or perversion. (Redf. Wills, vol. 1, p. 515; Clark vs. Fisher, 1 Paige, 171.)

" Anything in the character of the will which renders it contrary to natural affection, or what the civil law writers denominated an undutiful testament, as where children or others entitled to the estate in case of intestacy are wholly disinherited; or if not wholly deprived of a share, it is given in such unequal proportions as to indicate that it is done without any just cause, and wholly dependent upon caprice or over persuasion or deception, it must always excite apprehension of undue influence, at the very least." (Redf. Wills, 1, pp. 520–1, 2nd Ed.)

Gross inequality in the disposition of the property where no reason for it is suggested, either in the will, or otherwise, may change the burden of proof and require explanation on the part of those who support the will, to induce the belief that it was the free and deliberate off, spring of a rational mind. (Redf. Wills, 1, pp. 537, 538; Beaubien vs. Cicotte, 12 Mich., 459; Nelson vs. Wyan, 21 Mo., 347; Weaver's Appeal, 63 Penn. St., 309.)

IV. The court erred in not giving the opening and conclusion to the plaintiffs. The written admissions obviated everything that the Supreme Court of Missouri objected to on the subject. The decisions of the Supreme Court have not apparently been uniform on the subject of opening and conclusion. (McClintock vs. Curd, 32 Mo., 411.) On carefully examining the case of McClintock vs. Curd, and also the case of Farrell vs. Brennan, (32 Mo., 328,) it will be seen that we come within the reasoning of these decisions, and do not fall within the general rule laid down in the other two cases in 48 Mo., 291.

*Thomas Gantt with Glover & Shepley*, for Respondents.

I. The action of the court in giving the opening and the close of the case to the supporters of the will was proper. (Tingley vs. Cowgill, 48 Mo., 291; Cravens vs. Falconer, 28 Mo., 23.)

II. The first instruction given at the request of defendants was proper. In substance that instruction declares, that he who is competent to the management and disposition of his property, in the ordinary course of business between man and man, has sufficient capacity to devise or bequeath it by will.

This must be true, unless greater mental capacity is needed to make a will than is necessary to acquire by deed the property devised. The general rule has been laid down much more strongly than the defendants have occasion to insist on. The whole subject is fully discussed in ch. 4, p. 120, of Redfield on Wills, and it is conceived that it is not possible to accept this authority, and to rise from the perusal of that chapter without the conviction that there is nothing artificial or abstruse in the general question of testamentary capacity; that indeed, in many cases, a will ought to stand, although the capacity of the testator for the active business of life be gravely impaired; but that when this capacity to deal and cope with his fellows exists, there can be no doubt of his having sufficient capacity to make a will, because the greater includes the less. "If one be able to transact the ordinary affairs of life, he may, of course, execute a valid will," says Redfield, (p. 125, § 9). He seems to think the question one of which there is no reasonable doubt. He cites in his notes several cases, *e. g.*, 1 Bradford's Surr. R., pp. 360–362; Burger vs. Hill, and the cases cited by the surrogate from 26 Wend., 255; 3 Denio, 37, and 2 Comstock, 498, and thinks that they perhaps go too far. Certainly they go much further than we need desire, and further than the sensible rule laid down in Horne vs. Horne, (9 Iredell, 99) and in Converse vs. Converse, (21 Vermont, 168).

The subject is not capable of mystification, unless principles of criticism, which are believed to be well settled, are overthrown and superseded by others having as yet no countenance from courts of justice. At p. 128, § 12, of ch. IV., Redfield sums up the matter in this clear and emphatic way : " Hence the general rule undoubtedly is, that a less degree of mind is requisite to execute a will understandingly than a contract; but in some of the States it has been held that the capacity to make a valid will and a contract is precisely the same." That is, the rule to which there is no exception, is, that whoever is competent to transact his ordinary affairs, of which the making of a contract is a simple example, is, *a fortiori*, competent to make a will. This is the general rule. Some States have gone further, (and the author agrees with them, they being a majority in number, and more reasonable in their conclusions in his opinion) in considering that one may be able to make a valid will, though not competent to make a binding contract. But everywhere it is conceded, that if a man has capacity to make an ordinary business contract, he has, beyond doubt, the capacity to make a valid will. Now this is all which the first instruction of defendants asserts.

III. The fifth instruction refused has faults of its own more than sufficient to warrant its refusal. It would have told the jury that the deed of 1849, by which half a million of dollars worth of property was settled on the children of Mr. Benoist then living, was " no advancement," and therefore the jury must disregard it. Was it really imagined that the jury was impaneled to make an equal or rateable distribution of Mr. Benoist's property among all his children ? Was it this task or an answer to the question whether Mr. Benoist, when dividing his estate, was of sound mind, that they were sworn to perform ? It was of no possible relevancy to the discharge of their duty, that the deed of 1849 should be distinguished by this or that technical name.

IV. The third instruction refused makes it a negation of a sound disposing mind, memory and understanding on the

part of Mr. Benoist, if, when he made his will, he did not re-member each particular piece of his property, its situation, amount and value (for he is required to be capable of " esti-mating it," which means "stating its value," or else has no meaning at all). Now, every one knows that there is here an imposition on every large proprietor in this or any other city, which (if it be law) will disqualify every such person from making a will. Nay, it will disqualify every property holder, large or small, except such as have nothing but hard cash, and so every rich man must die intestate. For nothing con-ceivable is subject to greater variation than the estimates which different persons will put on the same property, whether this property be real estate or personal, improved and productive, or unimproved. But only one of these esti-mates can be, strictly speaking, correct, and the author of this particular estimate is the only person capable of estimat-ing it correctly—that is, of estimating it at all, for of course if incorrect estimates are meant, we are talking and listening to nonsense. To estimate is, " to form an opinion of the value of anything." Any dunderhead, any booby, can form an erroneous opinion of such value, but only he who can form a correct opinion of it is able to estimate it in any proper sense. It follows that, in the opinion of the draftsman of this instruction, whoever cannot form a correct opinion from day to day, of the value of each and every piece of property which he holds, must be deemed incapable of making a will. Such a test would have disqualified all the counsel engaged, all the parties to the cause, and every witness. Let it not be said that this is not the fair meaning of the instruction. It is this or nothing.

V. Of his state of mind when making his will, what he there declares is the best criterion; and if any one in his senses will read that will, it will be as easy for him to come to the conclusion that Mr. Benoist believed himself to be the Emperor of China, as that he believed himself to be "finan-cially ruined." He proclaims himself the proprietor of a country seat, which he gives to his widow for term of life,

devoting $30,000 to the purpose of keeping it in good order, and declares that he has provided adequately for one family of children by a settlement which appropriates for that purpose half a million of property. He gives to his servants, who have served him faithfully, generous bequests, and to his eight children and widow he gives the bulk of his remaining fortune. The court could not have given the instruction asked to the jury, without insinuating to them that the man who thus expressed himself might, nevertheless, contrary to all evidence, have supposed himself a pauper—for that, I take it, is the meaning of the figurative expression "financially ruined," employed by the draftsman. If it does not mean this the instruction will be vicious, as being couched in language calculated to mislead all the plain men on the jury.

*J. Wickham,* for Respondents.

I. It is well settled, that when one is able to transact the ordinary affairs of life, he is competent to execute a valid will. (Redf. Wills, 124, 125; Tompkins vs. Tompkins, 1 Bailey, 93; Coleman vs. Robinson, 17 Ala., 84.)

In point of fact it has been uniformly held, that a less amount of mental capacity than is required to enable a man to cope with the world at large, in contracts and in ordinary business transactions of every day life, will be sufficient to enable him to make a valid will; all that is necessary for this latter purpose, is that his mind and memory be sufficiently sound to make him know and understand the business in which he is engaged at the time. (Dunham's Appeal, 27 Conn., 192; McClintock vs. Curd, 32 Mo., 411; Harrison vs. Rowan, 3 Wash., C. C., 586; Keime vs. Keime, 9 Conn., 105; Stubbs vs. Houston, 33 Ala. 567; Converse vs. Converse, 21 Vt., 168.)

II. Great fault is found by the counsel for the plaintiff with an alteration made by the court below in one of the instructions asked on their behalf, to the effect that the false opinions supposed to have been entertained by the testator "solely" determined the disposition of his property; but the

best considered cases seem to hold, that, in order to render it invalid, the will must be shown to be the result and direct offspring of the false or exaggerated opinions. (Redf. Wills, 85, 86; Dunham's Appeal, 27 Conn., 172; Morgan vs. Bogs, Taylor's Med. Jur., 657; Thompson vs. Quinby, 2 Bradf., 449, 588, 589; 21 Barb., 107, 112; James vs. Langdon, 7 B. Monroe, 193, 198.)

If this opinion was founded upon the evidences of his financial condition and his knowledge and opinion of the value of his estate, and not upon delusion, it can have no effect to invalidate his will. (Capp vs. Fullerton, 34 N. Y., 190; Falleck vs. Atkinson, 3 Hogg Ec. R., 527.)

WAGNER, Judge, delivered the opinion of the court.

This was a proceeding on the part of the plaintiffs to contest the will of Louis A. Benoist, on the ground that at the time he executed it he was laboring under an insane delusion, and that undue influence was exercised over him. The will is dated on the 7th of August 1866, at St. Louis, Mo., and about the 1st of December, 1866, the testator left that city for Cuba, and died in the city of Havanna, during the month of January, 1867. The will was admitted to probate on the 4th of February, 1867, and letters testamentary were granted to two of the executors therein named. It seems that Mr. Benoist was thrice married. By his first wife he left no children. By his second wife, who died in 1848, he had two sons and three daughters. In 1849 he again married and his last wife survived him. By her he left five sons and four daughters. By a deed dated November, 1849, he conveyed to trustees real property considered to be worth $500,000, for the use of himself for life, and then to the use of his five children by his second marriage and their heirs, in fee. To the daughters a life estate was given, with remainder to their heirs.

By his will Mr. Benoist gave to his wife certain property for life, which he declared should be in addition to dower and not in lieu thereof. The second clause of his will was in the

words following: "Whereas I consider that I have amply already provided for all my other children than those begotten of my said wife, I therefore give to each of my children not begotten of my said wife, the sum of one hundred dollars, the same going to the descendants of such as may be dead at my decease, and no more." Subject to the above mentioned exceptions, he gave all the rest of his property to the children by his last wife.

He left an estate valued at $1,500,000, and his alleged insanity consisted in his believing himself poor, that the failure of his son had ruined him and that he was impoverished financially. In 1869, this proceeding was instituted to set the will aside, and two grounds therefor were alleged ; first, that when he executed it, Mr. Benoist was not of sound mind ; second, that he executed it under undue influence, exercised by the defendants and other persons, and under a delusion and mistake as to the value of the property he had given to the children of his two marriages. The answer denied every allegation in the petition ; denied that the testator was of unsound mind, or that he was unduly influenced, or that he was under delusion ; and averred that the will was executed understandingly and deliberately, after full consideration, without undue influence from any source, free from all delusions ; and that he was of sound and disposing mind, memory and understanding.

When the case was called for trial, the plaintiffs filed a paper by which they admitted that the signature of the will by Louis A. Benoist and the subscribing witness was genuine, and that the will must stand, unless the plaintiffs should satisfy the jury, either that the will was procured by undue influence, or that the testator was of unsound mind when he executed it, or that he executed it under mistake and delusion ; and thereupon they moved the court to award to them the opening and the close of the evidence and argument. This motion the court overruled and the plaintiffs excepted.

On the part of the defendants witnesses were then examined, who testified to the sound judgment, memory and busi-

ness capacity of the deceased down to the time of his departure for Cuba. The plaintiffs introduced and examined witnesses whose testimony tended to support the allegations contained in the petition.

The plaintiffs asked certain instructions which the court refused to give, but made some alteration in the following two, and then gave them of its own motion : 1st. "If the jury believe from the evidence, that on the 7th day of August, 1866, Louis A. Benoist was erroneously of the opinion that he was in danger of insolvency, or erroneously believed that he was financially ruined, or erroneously believed that he had already made more ample provision for his older children than he was able to make for the children of his last wife, and, by reason of such erroneous belief, made the instrument in dispute; or if the jury believe from the evidence that said Benoist, on the 7th day of August, had no definite or accurate knowledge of the amount or value of his property, and, by reason of said want of knowledge, executed the instrument in question ; or if the jury believe from the evidence that at said time he was in such a bodily and mental condition as not fully to understand and comprehend with reasonable certainty the state and condition of his property, and the true state and condition of his children, any and all of these facts may be considered by the jury as indicative of his mental condition, and from them it may be inferred that Benoist was not of sound and disposing mind on said day."

2nd. "If the jury believe from the evidence, that at the time Louis A. Benoist signed the paper, purporting to be his will, he was possessed with a false and exaggerated opinion and estimate of the value of the property he had previously settled upon the children of his second wife ; and was also laboring under a false and mistaken opinion of the nature and character of such settlement, and of the estates thereby created and vested in said children; and if they also find that at the same time he was possessed of a false and exaggerated opinion and belief of the smallness of the amount and value of the property which he then possessed, and of

the large extent of the losses he may have sustained through his son Sangninet H. Benoist, and of the ruinous effects of such losses upon his estate, which false opinions and belief he was incapable of divesting himself of, but acted on them, in executing the said instrument, as being true ; and that these false opinions solely determined the disposition of his property, contained in said instrument, then the jury ought to find that said instrument was signed by him under a delusion and mistake ; and that it is not the last will and testament of said Louis A. Benoist."

At the request of the defendants, the court declared the law as follows : 1st. "The jury is further instructed that testamentary capacity, or possession of sufficient mind to enable a man to make a will, is like the capacity to attend to his own affairs, if his bodily health permitted his attention to them. No man who is competent, mentally, to transact his ordinary business can be pronounced incapable of making a will, and unless the jury believe from the evidence, that Louis A. Benoist at the time of making his will (7th August, 1866), was of unsound mind and incapable of managing his affairs, they must find that the paper produced is his will, provided always that they believe that his signature and the signatures of the subscribing witnesses are genuine ; and that the matters stated by the witnesses in the certificate of attestation are true. 2nd. The court instructs the jury that by the deed of L. A. Benoist, dated November 20th, 1849, to trustees for his five children, read in evidence, an estate for life was vested in each of his daughters therein mentioned, and it was competent for each of his daughters to sell her interest in the property named in said deed if she chose to do so, there being no prohibition in the deed against such sale."

The instructions in reference to undue influence, I pass by, as there is in fact no such question in the case, there being no evidence to sustain the allegation, and it is not seriously contended for here. It is strongly insisted, however, that the court erred in rejecting the third instruction offered by the plaintiff, defining what constitutes a sound and dispos-

ing mind and memory, and I will transcribe it. It is as follows :
"The jury ought to find that the instrument probated as the
last will and testament of Louis A. Benoist, and in evidence
in this case, was not the last will and testament of said Be-
noist, unless they find from the evidence that at the time the
same was executed by him, he was possessed of a sound and
disposing mind and memory. Sound signifies whole, unbrok-
en, unimpaired, unshattered by disease or otherwise. Dispos-
ing mind and memory is a mind and memory capable of re-
collecting all the testator's property, and its amount, condi-
tion and situation; and of estimating it, and dividing it out;
and of comprehending the scope and bearing of the provi-
sions of his will ; and also of discussing and feeling the rela-
tions, connections and obligations of family and blood ; and
of recollecting all the persons who come reasonably within
the range of his bounty ; and also all he had previously done
for any and each of them ; and also the number, condition
and circumstance of those who are the proper object of his
bounty; and also of weighing their deserts with respect to
conduct, capacity and need, remembering all and forgetting
none."

No further notice of the instructions need be taken, as
these already given show the theory on which the court tried
the case, and the others, which were refused, either stated the
same propositions in different language, or they were entire-
ly unnecessary.

As to the action of the court in awarding the opening and
close of the evidence and argument to defendants, who were
the proponents of the will, there was no error. It must now
be considered as finally settled in this court, that where the
issues are made up, and the defendants are endeavoring to
establish or hold under a will, they affirm that the pa-
per writing is the last will of the testator, and they have
the affirmation of the issue to be tried, and they are en-
titled to the opening and conclusion. (See Harvey vs. Sul-
len's Heirs, 56 Mo., 372.)

The position now taken by the counsel for the appellants is that as they admitted the genuineness of the signatures of the testator and the witnesses to the will, that, therefore, the rule was changed. But they did not admit the sanity, or the sound and disposing mind of the testator, which was the main point in issue, and until that fact was satisfactorily established by the defendants, they had not made out their case and showed a good and valid will. This question was thoroughly considered in Delafield vs. Parish (25 N. Y., 9), and as the result of the authorities it was held, that in all cases the party propounding the will is bound to prove to the satisfaction of the court that the paper in question does declare the will of the deceased; and that the supposed testator was, at the time of making and publishing the document propounded as his will, of sound and disposing mind and memory ; and that this burden is not shifted during the progress of the trial, and is not removed by proof of the *factum* of the will and the testamentary competency by the attesting witnesses, but remains with the party setting up the will.

A disposing mind and memory may be said to be one which is capable of presenting to the testator all his property, and all the persons who come reasonably within the range of his bounty, and if a person has sufficient understanding and intelligence, to understand his ordinary business, and to understand what disposition he is making of his property, then he has sufficient capacity to make a will. (Harvey vs. Sullen's Heirs, *supra.*) In McClintock vs. Curd, (32 Mo., 411,) the most satisfactory test was declared to be, whether the mind and memory of the testator were sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed the will. The Supreme Court of Vermont in the case of Converse vs. Converse, (21 Vt., 168) lays down the doctrine that if the deceased was, at the time, capable of understanding the nature of the business and the elements of the will, that is, the nature and extent of his property and the persons to whom he meant to convey it, and the mode of distribution, it is sufficient; and in Horne vs. Horne, (9 Ired.,

99,) it is said, it is sufficient if the testator knew what he was doing, and to whom he was giving his property.

In 1 Redf. Wills, (p. 125, pl. 9,) it is declared that if one be able to transact the ordinary affairs of life, he may of course execute a valid will; and in Harvey vs. Sullen's Heirs substantially the same rule was announced in this court.

The definition, as to what constitutes a sound and disposing mind and memory, contained in the third instruction of the defendants, which was refused, was copied almost literally from the charge of the chief justice in Den vs. Johnson, (2 South., 454).

There after explaining to the jury the meaning and import of the word "sound" by itself, he went on and said, that a disposing mind and memory was a mind and memory which had the capacity of recollecting, discerning and feeling the relations, connections and obligations of family and blood. The whole charge, taken together, was approved in the Supreme Court, but it was intimated, that, in describing the force of the word "sound" itself, too strong language was used.

In the present case, it is not pretended that the deceased was affected with general insanity, but that he was a monomaniac, and laboring under a particular delusion. He seems to have had excellent business capacity, and managed his estate with skill and vigilance, and we see no objection to the courts confining the instructions to the special trait in issue.

It is, moreover, urged, that the court erred in declaring, that, in order to render the will invalid, it was necessary to find that the false and exaggerated opinions entertained by the deceased, in reference to the amount and smallness of the value of his property, and the losses he had sustained by his son, solely determined the disposition that he made of his property in that instrument. The correct principle is, that whenever a person imagines something extravagant to exist, which really has no existence whatever, and he is incapable of being reasoned out of his false belief, he is in that respect insane; and if his delusion relates to his property, he is then incapable of making a will.

But to invalidate the instrument it must be directly pro-
duced by the partial insanity or monomania under which the
testator was laboring.

In the case of Boyd vs. Eby, (8 Watts., 71,) the court say :
" If the erroneous and groundless impressions, received dur-
ing the time of this delirium, shall retain their hold, whether
by some physical derangement of the brain, or by some in-
delible stamp on the thinking faculties, that person must be-
considered still under delirium—the effect continues, and it
is only by effects that we can judge of the existence of the ex-
citing cause—and if he is under a delusion, though there be
but a partial insanity, yet if it be in relation to the act in
question, it will invalidate contracts generally, and will defeat
a will which is the direct offspring of that partial insanity."

A learned writer on Medical Jurisprudence, thus states the
rule in regard to pronouncing an instrument void by reason
of delusion. "The validity of deeds executed by persons
affected with monomania, often becomes a subject of dispute.
The practice of the law here indicates, that the mere exist-
ence of a delusion in the mind of a person does not necessari-
ly vitiate a deed, unless the delusion form the ground work
of it, or unless the most decisive evidence be given, that at
the time of executing the deed, the testator's mind was influ-
enced by it. Strong evidence is often derivable from the act
itself, more especially where a testator has drawn it up of his
own accord. In the case of Barton, (July, 1840,) the Ecclesi-
astical Court was chiefly guided in its decision by the nature
of the instrument. The testator, it appeared, labored under
the extraordinary delusion that he could dispose of his own
property to himself and make himself his own legatee and ex-
ecutor. This he had accordingly done. The instrument
was pronounced to be invalid. But a will may be manifestly
unjust to the surviving relatives of a testator, and it may dis-
play some of the extraordinary opinions of the individual, yet
it will not necessarily be void, unless the testamentary dispo-
sitions clearly indicate that they have been formed under a
delusion. Some injustice may possibly be done by the rig-

orous adoption of this principle, since delusion may certainly enter into a man's act, whether civil or criminal, without our being always able to discover it; but after all it is, perhaps, the most equitable way of construing the last wishes of the dead." (Tayl. Med. Jur., 656.)

Lord Brougham, in an important case before the Privy Council, (Waring vs. Waring, 6 Moore, P. C. Cas., 349,) advanced the remarkable position, that any person laboring under delusion or monomania, to any extent or upon any subject, was not to be regarded as competent to execute a valid will. But this singular and extraordinary ground has not been followed in England, and has received no countenance in the American Courts.

The main question in the case here was whether the testator's mind was affected, and in consequence of a monomania or delusion, he was therefore incapable of executing a valid will. That he possessed good business habits and was able intelligently to transact his ordinary affairs, the testimony leaves no doubt. If, then, any incapacity existed, it resulted from the delusion, which it is alleged he was laboring under. But the two instructions given by the court on its own motion, covered this whole question, and were entirely unexceptionable, and as favorable as the plaintiffs had any right to demand. It is evident that under these instructions, the jury must have been fully convinced from the evidence, that the testator was entirely sane, and not affected with either delusion or monomania. The remaining instructions were not only unnecessary, but some of them asserted incorrect propositions of law. The 5th instruction which told the jury that the deed made by Mr. Benoist in 1849, by which he settled a half a million of property on his children, then living, was no advancement, was rightly refused. It had nothing to do with the duty with which the jury were charged, namely, to ascertain the sanity or insanity of the deceased. It was not one of the functions of the jury to make a ratable or equal distribution of the property. Besides, in some of the refused instructions, the language of the will is misapplied.

The language of the testator expressed in the will is : "I consider and believe, that I have amply, already, provided for all my other children than those begotten of my said wife. I therefore give to each, etc." As to whether the provision made for the elder children by a former wife was ample, the testator was the sole and exclusive judge. No appeal would lie in respect to that matter to the courts.

Whether he had any idea of equality in reference to the distribution, was immaterial. He was not bound to distribute equally among the heirs. The civil law which prohibited parents from disinheriting their children, unless for good cause, does not obtain under our system of jurisprudence; under the common law, disinheritance or discrimination may take place without assigning any reason.

The will certainly does not bear any internal evidence that the testator considered himself ruined, or that he had forgotten any one who had claims on his bounty. His valuable country seat he expressly names and gives to his widow for her life, and then sets apart $30,000 to keeping it in good order. He declares that he has already adequately provided for a part of his children, and that he gives the remaining portion of his property to the rest. To invalidate the will it was necessary to show something extraneous, and the only pretense was, that the testator was affected with delusion, but after hearing evidence on the question, and acting under fair instructions, the jury have found that no delusion existed. That verdict is final. Upon a full review of the whole case, we can find no reason for interfering with the judgment.

All the judges concur, except Judge Napton, not sitting.