JOHN C. KING et al., Appellants, v. MAGGIE
GILSON et al.

### Division One, July 13, 1907.

1. **WILL CONTEST:** Evidence in Rebuttal. Plaintiffs (propo-
nents), in a will contest, should not be permitted to introduce
matters in chief after defendants have rested their case. Their
evidence in rebuttal should be confined to the new matters.
brought out by the defendants' evidence. But admitting the
evidence out of order may not be prejudicial. [Per **Woodson,**
**J.**]

2. —————: **Hypothetical Question: Left to Decide Fact.** The
expert should not be required to decide for himself which of
two witnesses testified to the truth regarding the testatrix's
loss of memory, and, hence, these words found in the hypo-
thetical question, namely: "Although it is charged by one
witness for the defendant that at an interview in the fall of 1893,
or early in 1894, she repeated a short story twice or perhaps
three times during the course of a half hour when they were
conversing on general topics, which statement is denied by
another unimpeached witness of high official standing in this
city," were improper. The assumed facts should be stated as
facts, so that the jury may consider or reject the opinion of
the expert, accordingly as they find the assumed facts to be
true or false.

3. **NEW TRIAL:** Newly-Discovered Evidence. The newly-dis-
covered evidence should be set out in the motion for new trial,
or it will not avail. The movent cannot state in the motion
that he has discovered material evidence which would pro-
duce a different result on a retrial, and depend on affidavits
to be subsequently filed to reveal what that evidence is.

4. —————: —————: **Diligence.** Where the affidavit states that.
affiant testified in the probate court, when the will was there
presented for probate, the same things set forth in the affi-
davit filed in support of a motion for a new trial of the case
subsequently brought in the circuit court, asking to have the
same will admitted to probate, the affidavit itself shows a lack.
of proper diligence to obtain affiant's testimony at the trial.

Appeal from St. Louis City Circuit Court.—*Hon.*
*Jesse A. McDonald,* Judge.

AFFIRMED.

*Kinealy & Kinealy* with *John M. Wood* and *R. L. McLaran* for appellants.

(1) There is no evidence to sustain a verdict against the will of Mrs. Lack of September 13, 1893. Story v. Story, 188 Mo. 110; Riley v. Sherwood, 144 Mo. 354; Sehr v. Lindeman, 153 Mo. 286; Cash v. Lust, 142 Mo. 639; Von de Veld v. Judy, 143 Mo. 363. (2) There being no substantial evidence to sustain a verdict against the will, it is immaterial whether or not any error was committed on the trial against defendant. Story v. Story, 188 Mo. 129. (3) The will is a reasonable one and is itself a strong proof that Mrs. Lack was then of sound and disposing mind. Gay v. Gillilan, 92 Mo. 264; 1 Wharton & Stille, Med. Jur. (5 Ed.), sec. 997. (4) Defendants in their hypothetical question to Dr. Runge admit the proof of facts, on the trial, from which the legal conclusion is that Mrs. Lack was of sound and disposing mind and memory when she made the will. (5) There is no error in the hypothetical question propounded by plaintiffs to the medical expert. Riley v. Sherwood, 144 Mo. 354; Century Dictionary, "Although"; Rogers on Expert Testimony, sec. 31 p. 74; State v. Morley, 102 Mo. 386. (6) The motion of plaintiffs for a new trial, so far as it was based on the discovery of alleged new evidence, was not before the court or made in accordance with the law of this State so that it could be considered or sustained. State v. David, 159 Mo. 535; Railroad v. Mirrilees, 182 Mo. 145; State v. Welsor, 117 Mo. 582.

*Isaac H. Orr, Jones, Jones & Hocker* and *Wm. H. & Davis Biggs* for respondents.

(1) (a) The question as to whether there is evidence to sustain a verdict against the will has been decided by this court on the former appeal of this case, to the effect that there was ample evidence on which to put the case to the jury. King v. Gilson, 191 Mo. 327.

(b) The records on both appeals being the same, the law of the case as declared on the former appeal is conclusive on this point. Taussig v. Railroad, 186 Mo. 269; May v. Crawford, 150 Mo. 223; Gordan v. Burris, 153 Mo. 223; Carey v. West, 165 Mo. 455; State v. Spencer, 166 Mo. 274. (c) Outside of the point being settled by the opinion of this court, there is ample evidence against the validity of the will of 1893. Roberts v. Bartlett, 190 Mo. 680. (2) The hypothetical question asked appellants' experts in rebuttal was clearly erroneous in this: (a) it was not proper in rebuttal; (b) the question permitted the expert to pass upon and determine a controversy as to the facts, to himself determine what were the facts; (c) the question contained matters wholly immaterial to the question which the expert was called upon to answer or submitted a question of fact to the expert and embraced immaterial matter for his consideration; (d) the question states a material fact as testified to by one witness, which fact the question sets forth is "denied by another unimpeached witness, of high official standing in this city." Russ v. Railroad, 112 Mo. 49; Hicks v. Railroad, 124 Mo. 125; Railroad v. Falvey, 104 Ind. 421; Williams v. State, 64 Md. 394. (3) The newly-discovered evidence was properly before the court. It came to the knowledge of defendants after the trial; it was not owing to a lack of due diligence that it did not come sooner; it is so material that it would probably produce a different result on a retrial; it is not cumulative and the affidavit of the witness is produced. State v. Speritus, 191 Mo. 41; State v. Sublett, 191 Mo. 175; State v. Cummings, 189 Mo. 646; State v. Murray, 91 Mo. 95; State v. Bailey, 94 Mo. 316; State v. McKenzie, 177 Mo. 699; State v. Carpenter, 182 Mo. 53; Devoy v. Railroad, 192 Mo. 197. The granting of a new trial on the ground of newly-discovered evidence rests in the sound discretion of the trial court.

Ins. Co. v. Curran, 45 Mo. 142; Coleman v. Cole, 96 Mo. App. 22.

WOODSON, J.—This is the second time this case has been appealed to this court. The first trial resulted in a verdict and judgment against the validity of the will, and upon appeal to this court the judgment was reversed and remanded for a new trial. The case is reported in the 191 Mo. 307, where the main facts are set out in full, and for that reason will not be restated here.

The cause was retried in the circuit court of the city of St. Louis, and the verdict of the jury sustained the validity of the will. In due time the defendants filed their motion for a new trial, which was, by the court, sustained, to which action of the court the plaintiffs duly excepted, and have appealed the cause to this court.

The facts disclosed by this record do not differ materially from what they were when the case was here on the former appeal, except some additional facts, which will be found in the course of this opinion.

I. It may not be out of place to state that the will in controversy is dated September 13, 1893, and the testatrix departed this life on July 26, 1899.

The will was first presented to the probate court of the city of St. Louis for probate, and, after a full hearing, it was rejected, and shortly thereafter this suit was instituted in the circuit court of that city, asking to have the will admitted to probate.

The validity of the will was assailed upon two grounds:

First: Because its execution was procured by fraud and undue influence exercised over the mind of the testatrix; and

Second: Because the testatrix was, at the time of

its execution, of unsound mind and disposing memory, and was on that account incapable of making a will.

The plaintiffs introduced evidence which made out a prima-facie case. The defendants then introduced evidence tending to prove undue influence and the unsoundness of the mind and memory of the testatrix; then the plaintiffs introduced evidence tending to contradict and rebut defendants' evidence.

Both parties asked many instructions, and the court selected certain ones from each list asked and gave them and refused the remaining. Those given correctly and fairly presented the law of the case to the jury; and no question is raised in this court as to the correctness of the court's action and ruling in giving and refusing instructions.

The plaintiffs' contention is, that the ruling of the court in permitting certain hypothetical questions hereafter mentioned to be asked, and the admission of the answers thereto in evidence, was proper and legal; and that the action of the court in sustaining the motion for a new trial, because of the admission of that evidence, was erroneous. While upon the other hand, the defendants insist that the action of the court in that regard was erroneous, and consequently its ruling in sustaining the motion for a new trial was proper.

We will dispose of those two propositions in the order stated.

It will simplify matters to here state that there were three or four expert witnesses who testified on behalf of plaintiffs in rebuttal, and there were from one to three hypothetical questions propounded to each along the lines of the one hereinafter set forth. All of these questions are assailed by the defendants. It will serve no good purpose to copy all of them nor to discuss them separately, because the objections lodged against each are substantially the same, and the ruling

upon one will apply equally well to all, as the same rule of evidence underlies all of them.

One of the hypothetical questions mentioned and the answer thereto admitted in evidence, over the objections of defendants, and the one we will consider, is as follows:

"Dr. Hughes:

"Q. Doctor, I will ask you another hypothetical question: Assuming the following facts are true, that the testatrix, Mrs. Emilie Lack, was a widow and executed a will on September 13, 1893, at the age of seventy-four years, in which the beneficiaries were her heirs-at-law, all persons of her own blood, and in which she excluded from its benefits three of her nephews, being the brothers Gus A. B. Brecht, Charles Brecht and Frank Brecht, alleging as a reason therefor that they had ill treated her and that Gus A. V. Brecht had defrauded her out of her property; that it was in evidence that she had lived with those brothers nearly from her husband's death to about fourteen months previous to the date of the will above mentioned; that Gus A. V. Brecht did previously and while she was living with him defraud her out of her property of the value of about twenty-three thousand dollars, part of which he restored in money, and the balance of which he paid after a judgment had been rendered against him; and that the other two brothers had insulted her and been guilty of various acts of mean treatment to her, including calling her a liar, and had repeatedly told her that she was a crazy servant girl, and they wished she was dead; and that at this time she owned property of the value of over twenty-two thousand dollars; that she had been married to one Frederick Lack, by whom she had no children; that her husband was the manager of a charity known as the Provident Association; and that she was a paid employee in that institution, her duties being to pay the employees, about ten or

twelve in number, and to dole out provisions and cloth-
ing to the poor; that in November, 1890, her husband
became sick of a complaint of which he died on or about
February 12, 1901; that when her husband became sick
she then commenced to be forgetful, but when her for-
getfulness of any fact was called to her mind she re-
membered her mistake and would say she had forgot-
ten it; and that at no time was she afflicted with a total
loss of memory, extending to her immediate family and
property; that evidence has been offered stating that
she exhibited fear of her life from those Brecht broth-
ers and feared the Catholics and wanted to propitiate
them with money; and evidence has been offered that
she feared they would kill her; that this condition con-
tinued until towards the end of December, 1890, when
she left the premises of the Provident institution and
was discharged from their employment; that soon
after her husband's death early in 1891, she went to
live with her three nephews, Gus A. V. Brecht, Charles
Brecht and Frank Brecht who are named in her will
made September 13, 1893, and was there swindled,
abused and called a liar and told repeatedly that they
wished she were dead, as already stated; that while
there she acted rationally and sensibly; that by efforts
of her relatives and of Finis Lack the question of her
sanity was submitted to a jury in March, 1892, and that
jury found that she was not of unsound mind and was
not incapable of managing her affairs; and within about
a month another jury found that she was of unsound
mind and was incapable of managing her affairs; and
that she, in July, 1892, went to reside at the house of
her half-sister, where she was treated with kindness
and rode out for exercise, and had rest, and that while
there and up to the date of this will and until her last
illness she was a great reader of the newspapers and
conversed rationally on what she read in them, and on
other topics, and exhibited no abnormal actions, and

was clear, normal, and rational in her language and acts *although it is charged by one witness for the defense that at an interview in the fall of 1893, or early in 1894, she repeated a short story twice or perhaps three times during the course of half an hour when they were conversing on general topics, which statement is denied by another unimpeached witness of high official standing in this city;* that she was highly educated and talked like a cultured lady, and that she so continued to act and converse until the time of her death on July 26, 1899, when she died of a chill after a sickness of a few hours; and that she was always, up to her last illness, a person of lady-like habit, very neat, cleanly and refined, and could always help herself. I will ask you now, whether in your opinion this lady was of a sound mind on September 13, 1893, and if she so remained until her death; I will ask you if she was afflicted with senile dementia?

"Mr. Jones: I object to the hypothetical question on these grounds: first, that the hypothetical question embraces facts elucidated by the witnesses, brought out by the witnesses of the plaintiffs in this case, on whom is the burden of proof; and it is not a proper question at this stage. It is not in any sense in rebuttal of defendants' proof or rebuttal of defendants' hypothetical question. We also object to the question on the ground that the hypothesis stated is not definitely stated, in that it recites a fact as having been testified to one way by one witness and another way by another witness, and puts upon the expert the duty of determining which is the correct statement of facts. Hypothetical questions must include facts and not evidence of facts.

"The Court: Objection overruled.

"To which ruling of the court the defendants, by their counsel, then and there duly excepted.

"Mr. Kinealy: Now, the first question was, was

she of sound mind? A. I understand the question.

"Q. If she remained so to her death, and if she was afflicted with senile dementia? A. I think she was as sound-minded as the average person of her years is, that she was not afflicted with senile dementia in the scientific sense of that term. Some people call all people demented who are not as quick-minded and as prompt in memory and understanding as themselves, or as they think they are, but, speaking from what I know, from the observance of old people and the treatment of old people who are sane, and from the additional knowledge that I have gathered from the treatment of people afflicted with genuine dementia, I should say that she had an average sound mind for an old person and that she was not demented.

"Q. Could you say whether or not she was of unsound mind, of any form, on those facts? A. There might have been transitory periods in her life when her mind was——

"Q. I mean in the period covered by these facts? A. She might have had delirium when she died.

"Q. That is a species of unsound mind, is it? A. It is a decided condition of unsoundness of mind.

"Q. Now, will you answer the other questions put as to whether or not she was sane when she died? A. She appears to have died sane.

"Q. I will ask you now if that woman was capable of understanding that she had property? A. Your hypothetical case states that.

"A. Yes, sir; the hypothetical case shows it there.

"Mr. Kinealy: Was she capable of understanding—— A. Let me tell you why. She had a purpose to execute, a will to execute, and she has received indignities from her nephews, and she remembered that she had received those indignities. She remembered her threat to carry it out in that will, and she made it

and she had mind enough to do it; and she could not be demented under those circumstances.

"Q. She had, then, mind enough to know that she had property to will, that she was making a will, and the persons to whom she intended to devise her property; is that so? A. I think so."

The defendants contend that this question was erroneous in this:

(1), It was not proper in rebuttal; (2), the question permitted the expert to pass upon and determine a controversy as to the facts, to himself determine what were the facts; (3), the question contained matters wholly immaterial to the question which the expert was called upon to answer or submitted a question of fact to the expert and embraced immaterial matter for his consideration; (4), the question states a material fact as testified to by one witness, which fact the question sets forth is "denied by another unimpeached witness, of high official standing in this city."

The first objection lodged against the question is, that it is not proper evidence in rebuttal.

The record discloses that at the trial the plaintiffs introduced evidence tending to prove the due execution of the will, and that the testatrix was of sound mind and disposing memory at the time of its execution, and then rested their case. Thereupon the defendants introduced evidence tending to show she was of unsound mind and incapable of making a will. In rebuttal, plaintiffs, over the defendants' objections, were permitted to ask the foregoing question of Dr. Hughes, which together with his answer were admitted in evidence, as before stated, which bore upon the testatrix's mental condition, one of the main facts to be established in order to make out a prima-facie case, to which defendants excepted.

The rule of procedure in establishing, or in con-

206 Sup—18

testing a will, in the circuit court, was fully and finally settled in this State by the decision of this court in the case of Harris v. Hays, 53 Mo. 90; Judge NAPTON, who wrote the opinion in that case, after reviewing the conflicting decisions of this court upon that subject, announced the rule of procedure in the following language: "The proper course, doubtless, is for the proponents of the will to introduce the subscribing witnesses, or, in case of their death, proof of their handwriting, and establish by them the execution of the will, and the sanity of the testator. This makes a prima-facie case, and the burden of establishing incompetency or undue influence rests then on the contestants."

This rule has been uniformly followed by the courts of this State ever since its enunciation. [McFadin v. Catron, 120 Mo. 252, 138 Mo. 219; Carl v. Gabel, 120 Mo. 283; Riggin v. Westminster College, 160 Mo. 579; Fulbright v. Perry County, 145 Mo. 432; Sehr v. Lindemann, 153 Mo. 276; Tibbe v. Kamp, 154 Mo. 545.]

That being the rule of practice, the plaintiff should not have been permitted to introduce evidence of matters in chief after defendants had rested their case. Their evidence in rebuttal should have been confined and limited to the new matters brought out by the defendants' evidence. In other words, plaintiffs should be required, in the first instance, to introduce their entire evidence in chief before resting their case, and not be allowed to divide it and introduce a portion of it in chief and the remainder in rebuttal. The defendants are entitled to know plaintiffs' entire case before they are called upon or required to meet and answer it, otherwise great injustice might be done defendants. We are, therefore, of the opinion that the evidence was admitted out of order, and that the action of the court in so admitting it was erroneous. But in this particular case we are not prepared to say it was prejudicial or reversible error. Defendants have not

pointed out in what manner they have been prejudiced or injured by the introduction of the evidence in the order mentioned.

The order of introduction of evidence is a matter resting largely in the sound discretion of the trial court, and if that discretion has not been abused to the detriment of the other party the action of the court will not be disturbed. [Garland v. Smith, 127 Mo. 567; State v. Buchler, 103 Mo. 203; State v. Daubert, 42 Mo. 239; State v. Linney, 52 Mo. 40; Pier v. Heinrichoffen, 52 Mo. 333; Ober v. Carson's Exr., 62 Mo. 209; State v. Murphy, 118 Mo. 7.]

But it is the better and safer practice to stick to the well-known and well-beaten paths established in the practice.

II.   The second and fourth objections refer to the words italicized in the hypothetical question, and are as follows: ''Although it is charged by one witness for the defense that at an interview in the fall of 1893, or early in 1894, she (the testatrix) repeated a short story twice or perhaps three times during the course of half an hour, when they were conversing on general topics, which statement is denied by another unimpeached witness of high official standing in this city.''

A person to be capable of making a valid will must be of sound mind and disposing memory, and only such persons have a disposing memory who are capable of calling to mind all their property and all the persons who come reasonably within the range of their bounty. [Benoist v. Murrin, 58 Mo. 307.]   So in this case it was material to inquire as to the memory of the testatrix, and the clause objected to in the hypothetical question had a significant bearing on her memory.   If the condition of her mind was such that she would repeat incidents or stories two or three times in the course of half an hour, the expert giving his opinion upon her mental

condition should know that fact and not be left in the dark as to that important question.

In answering the question as propounded, the physician was either compelled to ignore that portion of the question or to decide for himself which of the two witnesses testified to the truth regarding her repeating the story, neither of which had he the right to do. It was the duty of the jury, not of the expert witness, to say whether the testatrix repeated the story or not. In a recent case, in the discussion of this question, this court said: "Again, the question does not, in many respects, state the facts, but leaves it to the expert witness to say what the facts are, that is to say, whether the witnesses testified to the truth. . . . It was the duty of the jury, not of the expert witness, to say whether the physician wrote the letter. . . . . It is the province of the jury to say what the facts are, and the answer of the expert is of no value whatever if the jury do not believe the assumed facts to be true. . . . The assumed facts should be stated as facts, so the jury can consider or reject the opinion of the expert, accordingly as they may find the assumed facts to be true or false." [Russ v. Railroad, 112 Mo. l. c. 49; Hicks v. Railroad, 124 Mo. 125; Railroad v. Falvey, 104 Ind. 421; Williams v. State, 64 Md. 384.]

Again, in another case, this court said: "It is manifest that a very slight change of fact may lead to a very radical difference in the conclusion drawn from them. This is particularly true when the opinion of physicians is used to prove the effect produced upon the health of a person." [Hicks v. Railroad, 124 Mo. l. c. 125.]

We are, therefore, of the opinion that the court erred in the admission of that evidence.

The last objection to the question is, that it contains matters wholly immaterial to the question which the expert was called to answer. Counsel have not

called our attention to nor pointed out the immaterial matters complained of. We have carefully read the question, and have failed to discover any immaterial matters stated therein.

III. The record discloses that one of the reasons assigned by the court for sustaining the motion for a new trial was "the discovery of new evidence."

This evidence is contained in the affidavit of Dr. E. R. Waterhouse, who was the family physician of John C. King, the husband of the half-sister of the testatrix, and at whose house she resided during the last five or six years of her life. The affidavit is as follows:

"Eugene R. Waterhouse on his oath states that he has resided in St. Louis for the past eighteen years and has been a practicing physician during that period; that during the years 1897 and 1898 and 1899, I was the family physician in the family of John C. King, who lived at 1303 Washington avenue; that during said period I treated Mrs. King for a fistula and also treated Mrs. Emilie Lack, half-sister of Mrs. King; that during said period I visited their residence about seventy times and usually saw Mrs. Lack on the occasion of these visits; that I have examined the records of my office and find that the above visits were made by me; that from the first time I visited Mrs. King I noticed Mrs. Lack's physical and mental condition and also during the above-mentioned period, and from my observations and Mrs. Lack's actions and conduct I formed the opinion that she was a woman of undoubtedly unsound mind; that Mrs. Lack's actions were indicative of an unbalanced mind. When you would address her she would not answer, but begin to sing and hum and would have a vacant stare from her eyes; and that she bore all the symptoms of having an unsound mind; that this condition continued as long as I visited the King residence. Affiant further says in reference to Mrs. Lack's physical condition that she was unable to

care for herself; that she had lost control of her bowels and urinary organs and was slouchy and dirty in her personal appearance; that during a portion of the period I visited the King residence Mrs. Lack was taken care of by various servants whose names I do not know. Affiant further says that in my opinion the mental disease of Mrs. Lack was progressive in nature and that during the latter part of the above period she was wholly irresponsible and required constant watching. That on my first visits to Mrs. King's residence and when I noticed Mrs. Lack's peculiar actions, Mrs. King explained them by saying that her mind was wrong; and repeatedly thereafter Mrs. King made the same statement to me.

"Affiant further says that he was called to John King's residence on Gravois avenue, just before Mrs. Lack died, but was informed before he arrived at the house that Mrs. Lack was dead. Affiant further states that at the request of Mrs. King and in the company of Mrs. King I visited the probate court of the city of St. Louis in the year 1898 or 1899, to testify and did testify before the probate judge in reference to Mrs. Lack's physical and mental condition, to the effect that she was wholly unable to care for herself and that she was of unsound mind.

"Affiant further says that he also treated John A. King, son of John C. King, and was their family physician during the periods above mentioned."

The motion for a new trial was filed on March 27, 1906, and one of the grounds assigned therefor is in words as follows:

"11. Because, since the trial of this cause, the defendants have discovered new and important evidence material to the issues submitted to the jury, which evidence is not cumulative in character and which evidence was unknown to defendants at the time of the trial."

On the same day the court granted defendants ten days in which to file affidavits in support of motion for new trial; and within that time they filed the affidavits of Dr. Waterhouse, Arthur Marshall, Edward Unwin and J. H. Orr, one of the attorneys for the defendants, the three latter stating what diligence they had used in trying to discover all the witnesses and evidence in the case.

The plaintiffs contend that the action of the court in granting a new trial on the ground of newly-discovered evidence was erroneous.

The motion for new trial does not disclose or set out the newly-discovered evidence or its nature, nor does it give the names or addresses of the witnesses by whom the newly-discovered evidence was to be given, nor was there any affidavit filed with the motion.

The motion simply states that, "since the trial of this cause, the defendants have discovered new and important evidence material to the issues submitted to the jury, which evidence is not cumulative in character, and which evidence was unknown to the defendants at the time of the trial."

This question has been before this court repeatedly, and there is nothing new to be said upon it.

In the case of State v. David, 159 Mo. l. c. 535, this court said: "A new trial was also asked upon the ground of newly-discovered evidence, but the evidence was not set out in the motion. The mere fact, asserted in the motion, that the newly-discovered evidence was material, did not prove it to be so. It should have been set out in order that the court might pass upon its materiality. For these reasons, besides others unnecessary to mention, this question cannot be considered by this court."

And in the case of State v. Welsor, 117 Mo. l. c. 582, the law applicable to this question was stated in the following language: "In the case of State v. Ray,

53 Mo. 349, Judge SHERWOOD, in delivering the opinion of the court, says: 'In the State v. McLaughlin, 27 Mo. 111, this court adopts, with most cordial approval, the rules as laid down in Berry v. State, 10 Ga. 511, by Judge LUMPKIN in respect to new trials, on the ground of newly-discovered evidence, as follows: "The application must show, first, that the evidence has come to his knowledge since the trial; second, that it was not owing to the want of due diligence that it did not come sooner; third, that it is so material that it would probably produce a different result if the new trial were granted; fourth, that it is not cumulative; fifth, that the affidavit of the witness, himself, should be produced, or its absence accounted for; sixth, that the object of the testimony is not merely to impeach the character or credit of a witness." ' See, also, to the same effect, State v. Rockett, 87 Mo. 666; State v. Butler, 67 Mo. 63; State v. Carr, 1 Fost. (N. H.) 166."

In the case at bar, the affidavits were not filed in support of and in proof of the newly-discovered evidence stated in the motion for a new trial, because, for the very obvious reason, there was no such evidence stated therein; but the object and purpose in filing them was to bring the evidence itself and not the proof thereof to the attention of the court. The law requires such evidence to be set out in the motion; and the mere fact that it is so stated does not prove it to be true, and for that reason its truthfulness is required to be established by affidavits. But here the defendants are trying to make the affidavits serve a twofold purpose; first, a ground for a new trial, and, second, proof of the statements constituting that ground. This cannot be done. The motion for new trial must be filed within four days after the trial, and the court has no power to extend the time for filing it. If the evidence is set out in the motion, then this court has repeatedly held that

the trial court may give the parties time in which to file affidavits in support thereof.

The defendants state in their motion that they have discovered new evidence; that it was material to the issues; that it was not cumulative, and that if admitted in evidence probably a different result would be reached if a new trial was granted. If they knew such evidence existed at the time the motion was written, why did they not incorporate it into the motion and later file the affidavits in support thereof?

If such a practice as is contended for in this case was permissible, it would enable the parties to supplement and add to their motion for a new trial after the expiration of the four days allowed for filing it, and thereby open the door to temptation and fraudulent conduct in bolstering up motions for new trials.

There is an additional reason why the court should not have granted a new trial on account of the newly-discovered evidence, and that is because defendants did not show proper diligence in trying to discover the witnesses and evidence in the case. Dr. Waterhouse states in his affidavit that he was a witness in the proceedings in the probate court and testified as to Mrs. Lack's condition. Her mental condition was under investigation in those proceedings and Mr. Orr knew of them. The slightest investigation on his part would have revealed to him the names of the witnesses who testified as to her insanity in that court.

And again, he states in his affidavit that he had been King's family physician for five or six years, during the time the testatrix lived at his house, and that he made some seventy-odd professional visits there during those years, yet not a word of inquiry was ever made as to who the family physician was. Doubtless many neighbors could and would have furnished that information had they been asked. Proper

diligence was not shown. [Railroad v. Mirrielees, 182 Mo. l. c. 126-145.]

For the reasons stated in the first paragraph of this opinion, the judgment of the circuit court sustaining the motion for a new trial is affirmed.

All concur as to paragraphs two and three, but *Valliant, P. J.,* and *Lamm* and *Graves, JJ.,* dissent as to paragraph one.