CLAUDE H. LYONS v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

Division One, December 6, 1913.

1. LAW OF FORUM: Injury in Kansas: Trial in Missouri: Laws of Kansas not Pleaded nor Proved: Missouri Laws to be Applied. In an action in Missouri to recover damages for personal injuries suffered in Kansas, the laws of Missouri are to be applied when the laws of Kansas are neither pleaded nor proved.

2. NEGLIGENCE: Humanitarian Doctrine: Collision with Street Car. Where plaintiff was injured by a collision between his buggy and a street car at a crossing, and the motorman testified, in substance, that he saw the horse before the plaintiff could have seen the car and that he realized, from the horse's speed, that a collision was imminent, and where there is evi-

Lyons v. Railroad.

dence also that the motorman could have seen, and, in the exercise of reasonable care, ought to have seen the horse before he actually did see him but that he was not keeping his eye upon the track, having turned to look into the car, and where there was evidence too that he could safely have stopped the car after reaching the point from which he says he first saw the horse and before reaching the point of collision, there was no error in submitting the case to the jury on the humanitarian theory.

3. ———: ———: ———: Instructions. Where plaintiff's first and second instructions contain a correct announcement of the humanitarian doctrine, the defendant is in no position to complain because of their conflict with instructions given at its instance on the subject of contributory negligence which ignored the humanitarian doctrine.

4. ———: ———: Witness: Speed of Car. Where a witness testified that he had frequently ridden in street cars, noticing their speed, and had had occasion to estimate it at times, he was qualified to testify as to the speed of a street car which struck a buggy he was driving.

5. ———: ———: ———: Stopping Car: Qualification as Expert. Where a witness at one time had been in defendant's employ as a motorman and conductor for more than a year and was familiar with cars of the class to which the one which injured plaintiff belonged, had operated cars of that class, knew their equipment and the methods of stopping them, had also seen the tracks at the place where the accident occurred, and had been over the curve there several times and knew there was a grade at that point, there was no error in permitting him to testify respecting the distance within which the car could have been stopped.

6. EVIDENCE: Hypothetical Questions. Hypothetical questions asked of the physicians who treated plaintiff and of the surgeon who operated on him held correct.

7. ———: Of Examining Physician. The petition alleges that plaintiff's left kidney was crushed and that he was otherwise injured internally. There was evidence that the condition of the kidney, as disclosed by an operation, was probably due to traumatism resulting in a "fracturing in to the urinary or secreting parts of the kidney" followed by a leakage into the fatty tissues surrounding the kidney, and that the kidney seemed to have been "fractured" or "cracked" within its covering. Held, that a doctor's testimony as to an examination of plaintiff's urine six weeks after the injury and one week before the operation, which disclosed an excess of blood cells, which, the witness said, meant that blood was getting into the urine, was properly admitted.

8. ——: **Connecting Plaintiff's Condition with the Injury Alleged.** Where the record shows that the physicians who treated plaintiff and the surgeon who operated on him testified that the condition they discovered was due to traumatism (an injured or wounded condition) and that the injury received in the collision between the car and the buggy could, in their opinion, have caused the condition; where too there was no evidence that plaintiff had suffered any other injury which could have produced the condition and the surgeon testified that he had never known such condition to be present in a spontaneous case, i. e., a case of disease, defendant cannot successfully contend that there was no evidence that the condition of plaintiff's kidney was the result of the collision.

9. **NEW TRIAL: Newly Discovered Evidence.** *Held*, that, in the facts and circumstances set out in the opinion, the trial court properly refused to grant a new trial on the ground of newly discovered evidence.

10. **JUDGMENT: Excessive: Remittitur.** Plaintiff was injured by a collision between defendant's street car and a buggy in which he was riding. The circumstances of his injury and its results, including the "fracture" of a kidney, an operation upon it and much pain and suffering which still continue, are fully set out in the opinion. *Held*, that a judgment of $17,500 for plaintiff will be affirmed provided he file a *remittitur* to the amount of $7,500. [BOND, J., dissenting.]

Appeal from Jackson Circuit Court.—*Hon. Walter A. Powell*, Judge.

AFFIRMED (*as modified*).

*John H. Lucas* and *Charles N. Sadler* for appellant.

(1) The court erred in overruling the demurrer interposed at the close of plaintiff's evidence and renewed at the close of the case on the ground that under the pleadings and the evidence there could be no recovery. (a) The evidence does not support the allegations of the petition. Plaintiff must plead and prove every fact necessary in order to entitle him to recover. R. S. 1909, sec. 1794. A general denial puts in issue every allegation in the petition. R. S. 1909,

253 Mo. 10

sec. 1806. In actions for personal injuries, the law of the state, where accident occurs, governs. Newlin v. Railroad, 222 Mo. 391; Chandler v. Railroad, 127 Mo. App. 34; Rahn v. Railroad, 129 Mo. App. 686. Common law not presumed to exist in Kansas. Mathieson v. Railroad, 219 Mo. 542. (b) Under the laws of Kansas, the demurrer should have been sustained, on account of plaintiff's negligence. Mason v. Railroad, 27 Kan. 83; Railroad v. Schmidt, 67 Kan. 8; Zirkle v. Railroad, 67 Kan. 77; Railroad v. Withers, 69 Kan. 620; Railroad v. Holland, 60 Kan. 209; Lamb v. Railroad, 73 Kan. 220; Bressler v. Railroad, 86 Pac. 472; Burgess v. Railroad, 83 Kan. 497; Railroad v. Clinkenbeard, 72 Kan. 559; Dyerson v. Railroad, 74 Kan. 528; Libby v. Railroad, 77 Pac. 541; Campbell v. Railroad, 55 Kan. 536. (c) There was no evidence to justify a submission of the case to the jury, under the laws of Missouri, upon the humanitarian doctrine. McGanley v. Transit Co., 179 Mo. 583; Theobald v. Railroad, 191 Mo. 395; Riggs v. Railroad, 216 Mo. 304; Senn v. Railroad, 108 Mo. 151; Veatch v. Railroad, 129 S. W. 406; Markowitz v. Railroad, 186 Mo. 350; Grout v. Railroad, 125 Mo. App. 552; Mockowik v. Railroad, 196 Mo. 550; Graefe v. Transit Co., 224 Mo. 262; Warner v. Railroad, 178 Mo. 134; Boring v. Railroad, 194 Mo. 544; Dey v. Railroad, 140 Mo. App. 468; Hawkins v. Railroad, 135 Mo. App. 535; Cole v. Railroad, 121 Mo. App. 613; Ross v. Railroad, 125 Mo. App. 617; Bennett v. Railroad, 122 Mo. App. 710; Barnard v. Railroad, 137 Mo. App. 684; Cohn v. City, 108 Mo. 393; Roberts v. Tel. Co., 166 Mo. 371; Roenfeld v. Railroad, 180 Mo. 565; Gourley v. Railroad, 35 Mo. App. 92; Heinzle v. Railroad, 182 Mo. 554. (d) The plaintiff was guilty of contributory negligence. Rose v. Railroad, 113 Mo. App. 605; Boyd v. Railroad, 105 Mo. 371; Kinlen v. Railroad, 216 Mo. 164. Cases under (c), supra. (2) The court erred in giving instructions on behalf of plaintiff.

Frank v. Railroad, 57 Mo. App. 186; Boyce v. Railroad, 120 Mo. App. 168; Davidson v. Transit Co., 211 Mo. 320; Ingles v. Railroad, 145 Mo. App. 241; Mammerberg v. Railroad, 62 Mo. App. 363; Detrich v. Railroad, 143 Mo. App. 180; Conway v. Railway, 143 S. W. 516; Rush v. Railroad, 157 Mo. 504; Smart v. Kansas City, 91 Mo. App. 586; Young v. Railroad, 113 Mo. App. 636. (3) The court erred in refusing to give instructions asked by defendant. Cases supra. (4) The jury disregarded the instructions of the court and the evidence in the case. Allen v. Transit Co., 183 Mo. 432; Boyd v. Transit Co., 103 Mo. App. 303; Fleischman v. Miller, 38 Mo. App. 177; Gessley v. Railroad, 26 Mo. App. 156. (5) The court erred in admitting incompetent, irrelevant and immaterial evidence on behalf of plaintiff. Taylor v. Railroad, 150 Mo. 51; Glassgow v. Railroad, 191 Mo. 358; Taylor v. Railroad, 185 Mo. 255; Smart v. Kansas City, 91 Mo. App. 586; Young v. Railroad, 113 Mo. App. 636; Browning v. Railroad, 106 Mo. App. 729. (6) The verdict is excessive. Stoetzelle v. Swearingen, 90 Mo. App. 693; Taylor v. Railroad, 185 Mo. 239; Haynes v. Trenton, 108 Mo. 123; Newcomb v. Railroad, 182 Mo. 687; Stolze v. Transit Co., 188 Mo. 581; Bragg v. Railroad, 192 Mo. 331; Waddell v. Railroad, 213 Mo. 8; Briscoe v. Railroad, 222 Mo. 104; Wellman v. Railroad, 219 Mo. 126. (7) The court erred in refusing to consider affidavits of newly discovered evidence. State v. Murray, 91 Mo. 103; State v. Bailey, 94 Mo. 315; Folding Bed Co. v. Railroad, 148 Mo. 478. (8) The court erred in refusing to sustain the motion for new trial herein. Lehnick v. Railroad, 118 Mo. App. 616; Spohn v. Railroad, 87 Mo. 84; Price v. Evans, 49 Mo. 336; Fugler v. Bothe, 117 Mo. 502. (9) The court erred in refusing to sustain the motion in arrest of judgment. Cases under point 1.

*John T. Barker* and *Sparrow, Page & Rea* for respondent.

(1) The court did not err in refusing defendant's demurrer. Plaintiff made a strong case and is entitled to recover. Ellis v. Railroad, 234 Mo. 657; Moon v. Transit Co., 237 Mo. 425; Childress v. Railroad, 141 Mo. App. 667; Holden v. Railroad, 177 Mo. 469; Eckhard v. Transit Co., 190 Mo. 618; Cytron v. Transit Co., 205 Mo. 720. (2) Plaintiff did not plead nor prove the law of Kansas, neither did defendant; therefore the case was properly tried under the laws of Missouri. Coleman v. Locksinger, 224 Mo. 14; McDonald v. Ins. Co., 154 Mo. 618; Biggie v. Railroad, 140 S. W. 602; Bank v. Com. Co., 139 Mo. 124; Atwater v. Brokerage Co., 147 Mo. App. 447; Gimochio v. Railroad, 155 Mo. App. 168; McManus v. Railroad, 118 Mo. App. 566; Kollock v. Emmert, 43 Mo. App. 566; 16 Cyc. 1084; Telegraph Co. v. Crawford, 35 L. R. A. (N. S.) 930; Parrott v. Railroad, 34 L. R. A. (N. S.) 261. (3) It was not error to permit nonexperts to testify as to the speed of trains. Moon v. Transit Co., 237 Mo. 425; Ellis v. Railroad, 234 Mo. 684; Lynch v. Railroad, 208 Mo. 1; Stotter v. Railroad, 200 Mo. 128. (4) The affidavits for new trial were properly stricken out and their contents were not set out in the motion for new trial and they were filed more than four days after verdict and at a different term of court. Winn v. Grier, 217 Mo. 420; Carlton v. Munroe, 135 Mo. App. 172; Bunton v. Thomas, 134 Mo. App. 64; Obert v. Strube, 51 Mo. App. 621; Hesse v. Seyp, 88 Mo. 66; State v. Bowman, 161 Mo. 88; State v. McCullough, 171 Mo. 571; State v. Williams, 199 Mo. 137; State v. Nagle, 136 Mo. 50; King v. Gibson, 206 Mo. 264. (5) Plaintiff's injuries are permanent and he will be helpless the rest of his life; the verdict is not excessive. Corby v. Telephone Co., 231 Mo. 417; Gordon v. Railroad, 222 Mo. 516; Clark v. Railroad, 234 Mo. 396; Scullen v. Railroad, 184 Mo.

695; Markey v. Railroad, 185 Mo. 348; Copeland v. Railroad, 175 Mo. 650; Fullerton v. Fordyce, 144 Mo. 519; The Fullerton, 167 Fed. 1; Tel. Co. v. Engler, 75 Fed. 102; Morgan v. Railroad, 95 Cal. 501; Holland v. Railroad, 18 Ill. App. 418; Shaw v. Railroad, 74 Mass. 45; Howe v. Railroad, 62 Minn. 71; Schultz v. Railroad, 46 N. Y. Sup. Ct. 211; Wallace v. Oil Co., 12 N. Y. Supp. 425; Tuthill v. Railroad, 30 N. Y. Supp. 959; Dorsey v. Railroad, 66 Tex. 148; Hohn v. Railroad, 1 Tex. Civ. App. 36; Grover v. Rochester, 39 Hun, 5; Fisher v. Railroad, 38 Ill. App. 33; Bishop v. Railroad, 48 Minn. 26; Harrold v. Railroad, 24 Hun, 184; Dooley v. Railroad, 86 Ga. 294; Leseth v. Chicago, 43 Ill. 480; Collins v. Council Bluffs, 32 Iowa, 334; Alberti v. Railroad, 43 Hun, 421; Thompson v. Railroad, 64 Miss. 584; Porfert v. Railroad, 72 Tex. 344; Wilcox v. Railroad, 33 Ill. App. 450; Ehrman v. Railroad, 14 N. Y. Supp. 336; Roth v. Depot Co., 13 Wash. 525; Murray v. Railroad, 7 N. Y. Supp. 900; Erickson v. Railroad, 32 N. Y. Supp. 915; Woodbury v. District of Columbia, 5 Mackey, 127; Hall v. Railroad, 46 Minn. 439; Solen v. Railroad, 13 Nev. 106; Walker v. Railroad, 63 Barb. 260; Schneider v. Railroad, 15 N. Y. Supp. 556; Solarz v. Railroad, 29 N. Y. Supp. 1123; Ewing v. Railroad, 7 Tex. Civ. App. 8; Sears v. Railroad, 6 Wash. 227; Smith v. Whittier, 95 Cal. 279; Woods v. Trinity Parish, 21 D. C. 540; Friedman v. Railroad, 41 Ill. App. 270; Brazill v. Railroad, 78 Tex. 314.    (6)  Plaintiff's instructions properly declare the law and are more than fair to defendant and if defendant's instructions are in conflict defendant cannot complain.   Moore v. Transit Co., 193 Mo. 411; Heagy v. Lead Co., 101 Mo. App. 361; Hunt v. Lead Co., 104 Mo. App. 377; Weston v. Mining Co., 105 Mo. App. 702; Crawford v. Dappler, 120 Mo. 362; Anderson v. Terminal Co., 161 Mo. 411; Ellis v. Railroad, 234 Mo. 679; Berry v. Railroad, 214 Mo. 604.   (7)  Plaintiff's instructions are practically cop-

ied word for word from the following cases approved
by this court: Ellis v. Railroad, 234 Mo. 657; Cytron
v. Transit Co., 205 Mo. 720; Moon v. Transit Co., 237
Mo. 425; Eckhard v. Transit Co., 190 Mo. 281; Epp-
stein v. Railroad, 197 Mo. 736. (8) The verdict was
for the right party and should be affirmed. Where
apparent justice has been done appellate courts will
not interfere. Sec. 2082, R. S. 1909; Freeland v. Wil-
liamson, 220 Mo. 217; Stumpe v. Kopp, 201 Mo. 412;
Mann v. Doer, 222 Mo. 54; Logan v. Field, 192 Mo.
54; O'Keefe v. Railroad, 124 Mo. App. 613; Cross v.
Gould, 131 Mo. App. 585.

BLAIR, C.:—This is an action for damages for
injuries plaintiff alleges he received when one of de-
fendant's cars collided, at the crossing of Fifth street
and Haskell avenue, Kansas City, Kansas, with a
buggy in which plaintiff and his brother-in-law were
riding. The negligence charged in the petition is (1)
negligent, careless and reckless speed; (2) a negli-
gent, careless and reckless failure to give warning of
the car's approach to the crossing; and (3) that de-
fendant's servants in charge of the car did not employ
proper care to either slacken speed or stop the car
after they saw, or by the exercise of reasonable care
could have seen, plaintiff on said crossing. Then
follow allegations as to the injuries suffered. The
answer was a general denial. There was a judgment
for plaintiff for $17,500, and defendant appealed.

I. It is contended that since Kansas was the
scene of the injury there was no cause
of action unless the laws of Kansas gave
it, and that, as a consequence, pleading
and proof of the law of Kansas giving a
cause of action in the circumstances was
an indispensable prerequisite to a recov-
ery. No law of Kansas was pleaded or
proved by either party.

*Injury in Kansas: Trial in Missouri: Kansas Laws not Pleaded Nor Proved: Missouri Law Governs.*

In Thompson v. Railroad, 243 Mo. l. c. 349, plaintiff sought damages for personal injuries received in Arkansas, and this court unhesitatingly held that since "no statute or other law of Arkansas" was pleaded, the applicatory law was that of the forum; and in Biggie v. Railroad, 159 Mo. App. l. c. 351, the rule was stated to be that in a case of this kind "in the absence of a showing to the contrary, it will be presumed the laws of a sister State are the same as our own." There is a difference between these two principles (Cherry v. Sprague, 187 Mass. 113; 67 L. R. A. 33 and note), but it is not of a character such as materially to affect the question raised in this case, and need not be discussed. Under both views the trial court was right in trying the case under our law.

The cases cited by defendant's counsel (Mathieson v. Railroad, 219 Mo. l. c. 542, and Newlin v. Railroad, 222 Mo. l. c. 391, 392) were both actions founded on Kansas statutes, pleaded and proved, and must be read in the light of that fact. So read they furnish no support for the present contention. In the former the court, after saying the action was on the statute and a change of front would not be permitted, further held that the common law would not be presumed to be in force in Kansas. In doing so, however, it approvingly cited and quoted from cases in this State which lay down the rule adopted and applied in Thompson v. Railroad, supra. Properly understood that decision is no authority for saying that a plaintiff, injured in Kansas, who brings in the courts of this State an action for damages for injuries actionable under our general law of negligence, will, at the close of the trial, be turned out of court because he does not plead and prove the laws of Kansas applicable to the facts. In such case, unless defendant properly invokes the laws of the sister State, the law of Missouri is to be applied.

This conclusion renders unnecessary discussion of those assignments of error which proceed upon the assumption that the law of Kansas applies, and leaves for consideration only those rulings which are asserted to be erroneous when judged by the law of this State. These will be considered in the subsequent paragraphs.

II.  It is insisted that there was no evidence which justified the trial court in submitting the case to the jury on the humanitarian theory.  On this phase of the case there was substantial evidence of the following pertinent facts: Defendant's double tracks are laid east and west along Haskell avenue; Fifth street runs north and south, and at the intersection of the street and avenue the latter "jogs" south to such an extent that east of Fifth street its south line is quite or almost on a line with its north line west of Fifth street; in passing eastward across Fifth street defendant's tracks curve to the south, the curve beginning a little west of the west line of that street, to such an extent that the south or eastbound track approaches very near the curb on the south side of Haskell avenue, the sidewalk at that point being quite narrow; there is a two-story building on the southwest corner of the intersection of the street and avenue, and it and the awnings thereon as placed at the time of the accident so obstructed the vision of one coming from the south on Fifth street that he could not see defendant's tracks for any considerable distance west of the west line of that street until he had reached a point about fifteen or sixteen feet south of the south track; west of Fifth street the tracks are laid on a very perceptible up grade, estimated as three or four per cent; the accident occurred at about 11:30 a. m.; a mist or drizzle of rain was falling but there is no evidence this was of a character to obscure the vision.  Plaintiff and his brother-

*Humanitarian Doctrine.*

in-law, the latter driving, were in a one-horse buggy traveling north along the center of Fifth street which, at this point, is sixty or sixty-five feet wide between the property lines; as the vehicle approached the tracks its speed was slackened and its occupants listened for cars and looked both east and west but neither saw nor heard a car nor heard any warning of one's approach. Their view of the track west of Fifth street was obstructed by the building above referred to until the horse reached a point very near the track. Plaintiff testifies that when the vehicle reached a point where he could see to the west down Haskell avenue thirty or forty feet he looked in that direction but saw no car. At this time the horse was in five or six feet of the track and moving steadily toward it in a trot, and his speed is variously estimated by the witnesses at from two and one-half to ten miles per hour. At the moment the horse reached the south rail of the track or just after his front feet passed over it plaintiff and his brother-in-law, for the first time, they say, saw the car—then ten or twelve feet west of the west property line of Fifth street and thirty-five or forty feet from the horse. The car was moving at the rate of twelve or fifteen miles per hour. Plaintiff testified that at this juncture the motorman's face was turned toward the rear of the car, in the center of which the conductor, who was the only other occupant, was standing. Hedrick, who was driving the horse, saw the car at the same moment plaintiff did and immediately attempted to turn the horse to the right so as to get him off the track but this effort was unsuccessful, and the fender of the car "picked up" the horse and the car struck the left front wheel of the buggy and broke it, so that the axle fell, and plaintiff, who was riding upon the left side of the buggy, was brought down against the car, and the horse, buggy and occupants were dragged or carried in this position thirty or forty feet before the car

was stopped. The motorman testified that he "had on a full head of power up to about the property line" on the west side of Fifth street and that the car was moving twelve or thirteen miles per hour; that when he first saw the horse and buggy approaching the track the car was ten or twelve feet west of the west property line of Fifth street, and the horse's head was eight or ten feet south of the track and the horse was approaching the track at the rate of eight or ten miles per hour. On cross-examination the motorman further testified as follows:

"Q. What is a blind crossing? A. Where you can't see only to a certain extent. Q. To that extent then it's more dangerous than the open crossing? A. Certainly, I just said that. Q. And you, as a motorman running on that line, appreciated that fact that morning? A. Yes, sir. Q. And when you approached that crossing it was your duty as a motorman to have your car under control, expecting to see people crossing? A. Yes, sir. Q. You knew that was your duty that morning? A. Certainly. Q. A person approaching from the south and driving north over this railroad track, on account of the conditions which you have detailed could only see a very little distance up the track, you think, Mr. Trembley? A. I wouldn't know what you would call a little distance. Q. Well, just a short distance then. The building is an obstruction, isn't it, Mr. Trembley? A. Yes, sir. Q. Now then, you are very familiar with that crossing? A. I am. Q. Now, then, when the horse's head was about eight feet south of the track, as you told Mr. White you first saw it, the men in the buggy couldn't see the car at all, could they, Mr. Trembley? A. Not in the position they were in. Q. Naturally you, on the car, could see the horse's head first? A. Yes, sir. Q. Now, when you saw the horse's head, going at that speed, you knew he was going to try to cross the track, didn't you? A. No, I did not. Q. What did you think

the horse was going to do? A. Well, I didn't know.
Q. He was going pretty fast? A. Yes, sir. Q. With-
in eight feet of the track, going at the rate of speed
he was going, you knew it would be very difficult to
stop him after he got on the track? A. Certainly.
Q. So you knew he would likely be at the crossing
when you got there? A. Yes. Q. And you knew if
he was on the crossing when you got there, there would
be a collision A. Yes, sir. Q. When you were ten
or twelve feet west of the property line you first dis-
covered the horse's head? A. Yes, sir. Q. You say
ten or twelve feet west, that's just an estimate? A.
Yes, sir. Q. You are not pretending to give me the
exact feet now? A. No.''

He further testified that the horse traveled to the
track from the point where he first saw him in about
the same time the car traveled to the point of collis-
sion from the point about thirty-five feet west thereof,
from which point he first saw the horse's head; that
the occupants of the buggy could not see the car as
soon as witness could see the horse and that the horse
was nearly on the track before the occupants of the
buggy could see the car. He said he had given the
usual warnings of the car's approach to the cross-
ing and again sounded the gong as soon as he saw the
horse, denied turning his face from the front after
reaching the point twelve or fifteen feet west of the
west line of Fifth street, and declared he used every
effort to stop the car after he discovered plaintiff's
peril.

There was evidence that the car could have been
stopped safely in twenty-five or thirty feet and that
at the moment the car struck the buggy the motor-
man was setting the brake.

There was evidence which conflicted in several
respects with that set out but it is to be disregarded
in determining the question presented by the conten-
tion now being considered.

It was said in Ellis v. Metropolitan Street Railway, 234 Mo. l. c. 680, 681, in which there was evidence that the plaintiff, apparently oblivious to danger, drove upon the track and the vehicle he was in was struck and he was killed, that the duty of the motorman "did not commence merely when the horse's feet were actually on the south track. It commenced at such time as a prudent motorman could see that he [plaintiff] was intent on pursuing his journey across the track, oblivious to danger from the car. Then was when he came within the danger zone, and at and after that time the motorman, whose duty it was to see him, was not entitled to supinely await the event to see if the boy would save himself. He was obliged to act on reasonable appearances, put his car under control (if not already so), slack it, if he could, and stop it if necessary and if it could be done. . . . If the conduct and actions of a party approaching a street railway track would lead a motorman of ordinary prudence to conclude that such party was going upon the track in front of the car, the right of the motorman to act on the presumption that the person would stop before going on the track ceases."

In the case of Holden v. Railway Co., 177 Mo. l. c. 463, 464, the facts were that the injury occurred at a busy street crossing; that plaintiff was driving east on Pine street in a one-horse stake-wagon and was moving down grade in a trot at the rate of five to seven miles per hour and when the horse was four or five feet from the track he looked and saw a car coming rapidly about twenty-five feet away; the driver turned the horse diagonally across the street towards the north and after reaching the north crossing of Pine street, while one wheel of the wagon was on the car track, the car struck the wagon and plaintiff was injured.

In discussing the duty of the motorman in that case, this court (l. c. 470) said: "We take it, that if

the motorman discovered that the vehicle was approaching this crossing at a negligent rate of speed, and that he further observed that they were negligent in not looking out for the approach of the car, then, notwithstanding the negligence of the plaintiff, it was the duty of the motorman to so regulate the speed of the car, if in his power, as to avoid the infliction of any injury. In other words, the mere negligence of the plaintiff, in approaching and crossing the track, would not justify the infliction of an injury, if by the exercise of reasonable care and caution, it could be avoided. The servant will not be permitted to assume that a person is aware of the approach of the car and will stop, in due time to avoid injury, and at the same time admit that he knows that the person was not performing his duty in that respect, in ignoring the violent ringing of the bell, giving no attention or notice to the approach of the car.''

The same principle was approved in Eckhard v. Transit Co., 190 Mo. l. c. 618, 619; Moore v. Transit Co., 194 Mo. l. c. 12, 13; Powers v. Transit Co., 202 Mo. l. c. 281, and many other cases.

In view of the fact that in this case the motorman testified, in substance, that he saw the horse before the plaintiff could see the car and that he realized, from the horse's speed, that a collision was imminent and that there is evidence he could have seen and, in the exercise of ordinary care, ought to have seen the horse before he actually did see him but that he was not keeping his eye upon the track, having turned to look into the car, and also evidence that with the appliances at hand he could safely have stopped the car after reaching the point from which he says he first saw the horse and before reaching the point of collision, there was no error in submitting the case to the jury upon the humanitarian theory.

Numerous cases are cited as supporting a contrary conclusion. An examination of them discloses

that some are cases in which pedestrians stepped suddenly upon the track in front of street cars or railroad trains; in others the facts were that persons and vehicles were negligently on the tracks, and there was no evidence they could have been seen in time for the injury to have been avoided; in others there was nothing in the manner in which the injured person approached the track to indicate he would not or could not stop before going in front of the car or train; in others the person was injured while walking on the railroad track, nothing indicating an obliviousness to danger; others turn upon the absence of any substantial evidence to show that the injury could have been avoided after the injured person's peril was or ought to have been discovered. A detailed discussion of the cases cited is deemed unnecessary. A careful examination of them discloses that they are not opposed to the rule as above quoted and applied.

III. The first instruction for plaintiff is said to be erroneous (1) in that in connection with the submission of the humanitarian theory, the court, among other things, told the jury that it was the duty of the motorman, after discovering a vehicle in danger, "to use all reasonable effort consistent with the safety of persons on board to avoid colliding with them," and (2) in that it does not permit the jury to consider plaintiff's contributory negligence.

Instructions.

The first objection is answered by the authorities quoted in the preceding paragraph. The clause objected to correctly stated the motorman's duty in the circumstances premised.

The second objection is argued on the theory that the instruction conflicted with certain instructions given for defendant on the subject of contributory negligence.

It is not contended (except in the feature already mentioned) plaintiff's first and second instructions do not correctly formulate and apply the humanitarian doctrine. In fact they contain a correct announcement of it. Defendant is in no position to complain because of their conflict, if any, with instructions given at its instance on the subject of contributory negligence which ignored the humanitarian doctrine. [Ellis v. Metropolitan St. Railway, 234 Mo. l. c. 679.] It is suggested the jury disregarded these last mentioned instructions. There is nothing to indicate they were ignored except in so far as they conflicted with correct instructions given for plaintiff. To that extent they should have been ignored.

IV. (1) Another contention is that the witness Hedrick, who was driving the buggy, was erroneously permitted to testify as to the speed of the car. He testified he had frequently ridden in street cars and noticed their speed and had had occasion to estimate it at times. Defendant's trial counsel was tendered an opportunity to examine witness further as to his qualification and declined to do so, but objected that the witness had not "qualified as a speed expert." There was no error in overruling this objection and permitting Hedrick to testify. [Moon v. Transit Co., 237 Mo. l. c. 431, 432.]

*Witnesses.*

(2) There was no error in permitting the witness Lentz to testify respecting the distance within which the car could have been stopped. This witness at one time had been in defendant's employ as a motorman and conductor for more than a year and was familiar with defendant's cars of the class to which the one which injured plaintiff belonged, had operated cars of that class, knew their equipment and the methods of stopping them; he also had seen the tracks at the place where the accident occurred, had been over the curve there several times and knew there was

a grade at that point. Contrary to counsel's contention in his brief, the hypothetical question included the fact that the car was approaching the curve at Fifth and Haskell, the fact that it was moving up grade, and the fact that rain had been falling and it was drizzling at the time. There was no error in connection with the admission of this testimony.

(3) Exception was saved to the ruling permitting hypothetical questions to be propounded to physicians offered as witnesses. No authorities are cited and objections of a rather general character are made in the brief. The physicians who had treated plaintiff's injuries and the surgeon who operated on him were the witnesses to whom the hypothetical questions were propounded. The object of these questions was to elicit testimony as to whether the condition of plaintiff's left kidney could have been due to the collision with the car. The question hypothesized the facts of the accident, as detailed by the plaintiff and his brother-in-law, and in each instance the inquiry, in effect, was whether the conditions the witness actually discovered could have been the result of the accident. There was no error.

Hypothetical Questions.

(4) It is urged it was error to permit Dr. De-Lamater to testify as to the results of an examination of plaintiff's urine six weeks after the injury and one week before the operation occurred. The testimony was that the examination of the urine disclosed an excess of blood cells in the urine which, the witness said, meant that blood was getting into the urine. It is insisted this testimony was not within the allegations of the petition. It was alleged that plaintiff's left kidney was crushed and that he was "otherwise injured internally." There was evidence that the condition of the kidney which the operation disclosed was probably due to traumatism resulting in a "fracturing in to

Evidence of Examining Physicians.

the urinary or secreting parts of the kidney" followed by a leakage of the urine into the fatty tissues surrounding the kidney; and that the kidney seemed to have been "fractured" or "cracked" within the capsule or covering which incloses it. The examination of the urine was simply one of the methods adopted which disclosed the condition of the kidney and led to the operation plaintiff underwent. The evidence was relevant to the issue whether plaintiff's kidney was crushed as alleged.

(5) It is also insisted that there was no evidence that the condition of plaintiff's kidney was the result of the collision. The record shows

Connecting Plaintiff's Condition With the Injury Alleged.

that the physicians who treated plaintiff and the surgeon who operated upon him testified that the condition they discovered was due to traumatism (an injured or wounded condition) and that the injury received in the collision of the car and buggy, in their opinion, could have caused the condition discovered. There was no evidence plaintiff had received any other injury which could have produced the condition the surgeon found. The surgeon testified he had never known the condition he found to be present in a "spontaneous case," i. e., a case of disease. The contention is not well founded.

V. Error is assigned on the trial court's refusal to grant a new trial on the ground of newly discovered evidence. The motion for new trial neither

New Trial: Newly Discovered Evidence.

stated the evidence discovered nor gave the names of any witnesses nor stated the diligence used before the trial. The affidavit of counsel filed with the motion was to the effect that counsel had heard, prior to the day the motion for new trial was filed, that plaintiff had been engaged in a fight in Denver, Colorado, after he was

injured and four months before the trial, but when this information first came to counsel his affidavit did not disclose. It is stated, however, that he first learned on the day the motion was filed that one Tuder was an important witness and would state that plaintiff and his brother had a fight in which plaintiff claimed his injury was aggravated. Tudor's affidavit was filed. In this it was stated affiant was told that plaintiff and his brother were fighting and when affiant went to the room plaintiff looked pale, excited and nervous; and plaintiff and one Waddell, who was present, told affiant plaintiff's brother was intoxicated and had attacked him, whereby plaintiff's injuries were aggravated. Affidavits of plaintiff, his brother and Waddell were filed by plaintiff, and in all it was stated that no altercation between plaintiff and his brother had occured, and the physician whom Tudor swears he called to attend plaintiff made affidavit that he found plaintiff suffering from a cold and "found no marks or bruises on plaintiff or anything that would indicate he had had a fight." Subsequently and at the succeeding term of court, and several weeks after the trial, affidavits as to plaintiff's condition prior to the date of his injury were filed. In none of these is there anything to indicate that plaintiff's kidney was previously affected. A motion to strike out these affidavits was immediately filed, and plaintiff filed counter-affidavits of numerous persons tending to show plaintiff, prior to his injury, was a strong, active, healthy man. The court struck out the affidavits at which the motion mentioned was aimed.

The facts in this connection have been fully set out because of the earnestness of the insistence of counsel for defendant that this ground for the motion should have been sustained.

The applicable rule has been recently discussed and applied (King v. Gilson, 206 Mo. l. c. 278 et seq.; Winn v. Grier, 217 Mo. l. c. 461) and it is clear the

ruling in this case is justifiable on the simple ground that the motion was insufficient in so far as the ground relating to newly discovered evidence is concerned.

In addition, the court would have been fully justified in putting its ruling on the ground that the probative force of the affidavits defendant filed was so slight and that of the counter-affidavits so great that there was no reasonable probability that a different result would have been produced by any evidence the affidavits disclosed defendant could have obtained. [Devoy v. Transit Co., 192 Mo. l. c. 218.]

VI. Finally, it is urged that the verdict is excessive. In so far as the argument is directed to the

Verdict. question whether the injury to the kidney was the result of the collision with defendant's car it need not be considered further than to say there is full and ample evidence justifying a finding against defendant on that issue and the jury found that way.

There is evidence tending to show that prior to his injury plaintiff was a strong, active man. He was thirty-seven years old and engaged in the real estate business in Kansas City. His injury did not immediately disable him but caused much pain. A few hours afterward plaintiff took to his bed where he remained for six days and nights, suffering great pain. Thereafter, for a week, he was able to go to his office for an hour or two each day though suffering considerably during this time. During this week he was examined by Dr. McDonald. There was no external wound or bruise. On June 29th, thirteen days after he was injured, plaintiff again was confined to his bed and Dr. McDonald was called. Subsequently, July 27th, Dr. DeLamater was also called into the case. He testified he found plaintiff suffering agonizing pain over the left kidney and extending down the ureter to the abdomen. On August 3rd, other treatment having failed, plaintiff was operated on by Dr. Hill. The

operation was a serious one. An incision was made in the left side and the kidney exposed, ''the lymphatic capsule was dissected loose'' and found to be hard and compressed, and the capsule was then stripped and the interior (of the kidney) was opened and a drainage tube put in place in the kidney through which the urine was discharged out of the back for about four months. The operation necessitated the handling of two spinal nerves which of itself caused pain which would require two weeks or more to disappear. Plaintiff was in the hospital for six weeks. The operation relieved the prior particularly painful symptoms and plaintiff's condition was considerably improved when he left the hospital. The result of removing the fatty tissues or capsule around the kidney was to deprive the kidney of support so that it hangs lower than it should and this interferes with the kidney's function and produces pain. This condition is permanent unless corrected by another operation. From the time he left the hospital until the following January (1909) plaintiff was confined to his bed most of the time and suffered considerably. In August, 1909, a year after the operation on plaintiff, Dr. Willetts examined him and found him ''exceedingly nervous, bordering on a state of melancholia almost, a nervous exhaustion; very much depressed, very weak, a good deal of pain in the left side, radiating forward over the abdomen.'' In October, 1909, plaintiff went to Denver and returned suffering much pain and was nervous and troubled with insomnia. Dr. Willetts visited plaintiff frequently during the winter, every day for a time, and says he suffered a great deal of pain, was nervous and much depressed, and for only a few weeks before the trial (February, 1910) was able to be out much. Plaintiff's left leg still swells and pains him, and walking is painful. His condition was still painful at the time of the trial. Physicians testified his injury was of a permanent character.

The trial court heard the evidence and saw the plaintiff at the trial and approved this verdict. That court was then in a better position to judge of the fairness of the verdict than this court can be now. [Gordon v. Railroad, 222 Mo. 1. c. 539.] This is particularly true because of the nature of plaintiff's injury and the character of its effect upon him. There was ample evidence plaintiff had suffered a great deal of physical pain and mental anguish and that he was doomed to further suffering. One of his vital organs has been permanently and painfully injured, and after a serious operation by a skilled and experienced surgeon that organ yet fails to perform properly its natural function, with the result that plaintiff suffers considerable pain which he must endure in the future also unless he submits to a second operation and his kidney is restored to its proper position. This alternative itself is a trying one and one which is to be considered in determining the question as to the excessiveness of the verdict. Plaintiff's left leg is also in such a condition that it pains him when he walks. He has been weakened, generally, by his injuries and sufferings, and there is testimony (his own and that of his physician) that opiates and bromides are frequently, if not usually, necessary to induce sleep. His nervous system has been affected until he has been upon the verge of melancholia. It is difficult for this court to say that such injuries and suffering in the past and the pain the future threatens are more than compensated by this verdict—particularly in view of the character of plaintiff's injuries and the fact that the verdict was returned by a jury and approved by a trial judge who saw the plaintiff in court and heard the witnesses. In some cases the injuries are of a character that does not give trial courts much advantage in determining the justness of the amount the jury allows. In such cases this court has, more freely than in others, reduced judgments in its opinion too large.

In this case the plaintiff's appearance at the trial is an element of much greater importance than it could well be in case of the loss of a limb and like injuries. In this case plaintiff's disability resulting from his injury, while not complete, is very considerable and his suffering has been great, and, it seems, will continue at least until another serious operation is performed which may effect his recovery and might, it is reasonably inferable, result in his death. With a dilemma of this kind before him and injury and suffering of the kind described behind him, it would, on this record, be venturing a good deal to hold that the jury and trial court with the plaintiff before them went materially astray in the sum they allowed plaintiff. The judgment should be affirmed. *Brown, C.,* concurs.

PER CURIAM.—In the foregoing opinion of BLAIR, C., *Bond, J.,* concurs; *Woodson, P. J.,* and *Lamm* and *Graves, JJ.,* are of the opinion that the judgment is excessive in the sum of $7500, **Excessive Verdict.** and that it should be reduced to the sum of $10,000. A majority of the court being of the opinion that the judgment should be reduced to ten thousand dollars, to bear date of the original judgment, it is, therefore, ordered that if the plaintiff will, within ten days from this date, remit the sum of seven thousand and five hundred dollars as of the date of the original judgment, then the judgment after such remittance will be affirmed in the sum of ten thousand dollars as and of the date of the original judgment; otherwise the judgment is reversed and cause remanded. *Bond, J.,* dissents from this disposition of the case.