317 S.W.2d 462 (1958)
E----, Plaintiff-Respondent,
v.
G----, Defendant-Appellant.
Nos. 7702, 7712.
Springfield Court of Appeals, Missouri.
October 3, 1958.
*463 Douglas W. Greene, Springfield, for defendant-appellant.
James H. Keet, Springfield, for plaintiff-respondent.
RUARK, Judge.
The principal case involves the custody of three girls, all of tender years. Because these children should not, in later years, be unnecessarily plastered with the mud thrown by their parents, we avoid identification of the parties. On April 24, 1954, plaintiff *464 secured a decree of divorce from defendant and judgment for nominal alimony. At that time there were of the marriage two daughters, then ages three and one, and plaintiff was pregnant. The decree provided that jurisdiction of the named children and the unborn child was retained for the purpose of making orders touching their custody and support in the future.
On February 2, 1957, defendant husband, now appellant, filed motion to modify. This motion set up the fact that the third child, also a daughter, had been born; charged that since the divorce the wife had habitually conducted herself improperly by having degrading associations with "other" men; and the prayer was for award of custody to defendant father or, in the alternative, to the paternal grandparents. The answer denied the charges of misconduct on the part of the mother, charged that the father had made continuing attempts to wean the children from the wife, was of unsuitable temperament to have custody, and was not so situated as to be able to care for the children properly. Such answer prayed for award of custody to the plaintiff mother.
These people apparently had their origin in a small town not too far distant from a fairly large city. The record does not show their ages, but the evidence indicates that both of them are young, with plaintiff probably in her twenties. Both maternal and paternal grandparents live in the town of origin. At all times here concerned it appears that defendant was and is steadily and regularly employed as an electrician in the city, and his income is approximately $100 per week. It appears that at the time the original decree was rendered the two then living children were in the physical custody of the paternal grandparents.
After the divorce in April plaintiff went to the city and until August 1954 stayed in the YWCA and attended business school. The baby, another girl, was born in October. (Incidentally, this child suffers from a heart defect, has been hospitalized several times, and requires medical care.) At some time in the late summer or fall of 1954 it appears that the parties went back (without benefit of clergy) and lived together in the city for approximately a year. Plaintiff then left this arrangement, took the children, and went to the maternal grandparents. Several weeks later she left her parents' home and lived at several places in the city and for a short period in the state of Texas, where she had employment. During most of this interval the two older girls stayed in the home of the paternal grandparents and the baby was under the care of the maternal grandparents. In May 1956 occurred the abortion or the kidney stone incident (whichever it was) which we will mention hereafter.
In June of 1956 plaintiff and defendant entered into an arrangement whereby defendant provided a home in the city for plaintiff and the children, he to pay the household expenses and she to care for the children, prepare defendant's meals, and do his laundry. Defendant was to have sleeping quarters elsewhere. In short, as plaintiff put it, it was "just as if we were married except he wouldn't be living there." Within a few weeks and against defendant's wishes, as he contends, but by reason of financial necessity, as plaintiff contends, the plaintiff took a job at which she worked, for the first six weeks during the day, and after that at night. After plaintiff began work, both parties contributed to the household expenses. During this period plaintiff kept: the children in the daytime and defendant stayed with them at night while plaintiff was at work. In November 1956 plaintiff employed a baby-sitter and took in another woman, a fellow employee, to live with her, an arrangement to which defendant objected.
In January 1957 the "arrangement" broke up. The immediate cause appears to have been a quarrel which was occasioned because a man with whom plaintiff had gone out previously (and one who defendant claims was involved in the alleged abortion incident) returned to the city and *465 plaintiff commenced seeing him again. The upshot of this quarrel was that defendant announced he was (forcibly) taking the children away from plaintiff and to his parents' home. Plaintiff testified that she objected most strenuously to his taking the baby, because the night was cold and she did not want the child to be outside. The result was a charge of assault against defendant in city court (of which he was later acquitted); but defendant had the children, at his mother's house, and later he had plaintiff evicted from the city house and moved in himself. About this time plaintiff took another job in the city, where she worked from 1:00 a. m. to 7:00 a. m., and she was still so employed at the time of trial.
Up to this time there is no doubt that the defendant had some character of affection (physical or otherwise) for the plaintiff. It is doubtful that the attraction was mutual. At one point plaintiff testified that the sexual relations in the marriage had been "unsatisfactory." Plaintiff testified that on several occasions after the divorce defendant forced sexual relations upon her. The incident of a torn-up room and bruises on the plaintiff and scratches upon defendant on one occasion tend in some measure to verify this accusation. Plaintiff's evidence would indicate that defendant was unreasonably jealous and did not wish her, although divorced, to associate with other men. Defendant's testimony, on the other hand, would tend to prove that plaintiff was leaving the children uncared for on numerous occasions in order to run about at night.
The defendant was remarried on August 8, 1957, pending the hearing of this case below.
Defendant's charges of plaintiff's unfitness: One of the most serious charges made by the defendant is that in May 1956 plaintiff became pregnant by another man, one J., the same man over whom they had the quarrel which preceded the last separation. According to defendant's testimony, he loaned money to plaintiff and to J. to pay the expenses of an abortion. He said that he took her to the doctor to have the abortion performed. He also said that the January quarrel (the one which resulted in the last separation) arose because J. returned to town and called on the plaintiff; that he demanded repayment of this loan and that J. refused repayment at the urging of the plaintiff. All this (concerning the abortion) the plaintiff denied. She denied having had sexual relations other than those forced upon her by her ex-husband or having been pregnant since the birth of her third child. She testified that she did go to a doctor, but for treatment of what was first diagnosed as kidney stones and later as an intestinal block.
Defendant also testified that on another occasion, a few months after the "abortion-kidney stone incident" and while the parties were proceeding under the "arrangement," he came in the house at night and found plaintiff in bed, unclothed, with yet another man. This also plaintiff denied. While she admitted that the other man was present, and identified him as a friend who had brought medicine for her and the children, she denied being in bed with, or any improper conduct with, the visitor.
Defendant also testified that plaintiff had dates and went out almost every night and "never would stay home." On the other hand, plaintiff's testimony was that for a period of three months, before the commencement of the last "arrangement," she did go out, but defendant "threw such a fit" that she refrained from dating until she again began going out with J. (the man because of whom the final quarrel arose) in January 1957. She said that she has not dated since March 1957, but admitted that upon several occasions she has gone out dancing with a group to various taverns, her participation in those parties always ending by 12:30 because she goes to work at 1:00 a. m. She produced some evidence that she seldom goes out, but stays at home and sews.
*466 Defendant produced evidence that plaintiff was evicted from two apartments in the city, once on the complaint of other tenants who were disturbed by activities in the nighttime. Plaintiff denied one eviction and her explanation of the other is that this was before the final "arrangement" was entered into; that defendant was beseeching her to remarry him and that he came to her apartment day and night. Defendant denied that he called at the apartment with such frequency but said he came only about twice a week, and then only to see that she had everything she needed.
Plaintiff's charges of defendant's unfitness: Plaintiff testified that the defendant was given to moods of despondency and depression; that he sometimes had severe headaches and crying spells; that on one occasion he locked himself in the bathroom and threatened to kill himself and finally lay crying on the floor. She also testified that defendant's present wife told her that she and her family feared that defendant was "on the verge of a crack-up." Introduced in evidence was a rather long letter which defendant wrote to plaintiff and which plaintiff says he handed to her shortly before the final break-up in January of 1957. Without setting forth this letter in detail, we may say that it could well be argued that it indicated some incoherence and emotional instability. In the reverse, defendant testified that he is in good health and that he never loses time from work, and there is nothing to indicate that he is not steadily employed and does not do satisfactory work.
Plaintiff also testified, and there is further evidence to sustain her contention, that the father attempted to estrange the children from the plaintiff, tried to prevent her seeing them, and refused to permit them to receive some of her gifts. And, after he took the children from her, there is some evidence to indicate that her attempts to visit the children when they were living in the home of the paternal grandparents, where he had placed them, were made unpleasant because of the cooperation of these grandparents with their son, the defendant. It is further quite apparent that after the defendant was remarried in August 1957 and brought his present wife to the city and installed the children there with her, he gave orders to the present wife not to permit plaintiff's visitation or telephone contact with the children without first receiving his permission on each occasion. It is shown that, at least once, he physically interfered with and stopped a telephone conversation between one of his daughters and the mother-plaintiff.
Finally there is the question of defendant's remarriage. There was evidence on behalf of plaintiff which indicated that defendant and his wife were brought together through a "lonely hearts club," although both of them denied that they met through any such agency. This present wife was pregnant at the time of the hearing in October. She testified that she was married to the defendant on August 8, that the doctor first told her about the first week in September she was pregnant, and that her baby would be born early in the spring. Plaintiff testified that the present wife told her the child she carried was not defendant's and that she had been pregnant three months when they were married. The present wife denied any such conversation and said she was "not to my knowledge" pregnant at the time she married defendant.
We think the evidence leaves no doubt that both plaintiff and defendant love, care for, and want the best for their children. Plaintiff produced considerable evidence as to her care of the children, her making dresses for them, her playing with them, and demonstrations of affection between mother and children. Defendant produced as a witness the maternal grandmother, a believer in rigid conduct who was quite evidently at outs with her daughter. This grandmother testified as to the well-kept cleanliness of the children while they were in defendant's custody, and she complimented *467 her son-in-law on his training of his children in that they are "not smothered with love."
On the foregoing evidence the trial court found that it was for the best interests of the children that they be awarded to the plaintiff mother. Such custody was so adjudged and defendant father was required to pay support in the sum of $44 per week, to commence on December 7, 1957. From this judgment defendant has appealed. Complaint is made that the greater weight of the evidence shows that the plaintiff was legally and morally unfit and that defendant was legally and morally fit to have the custody.
The parties are not in disagreement concerning the law. They agree that in an award of custody the paramount objective is the welfare of the children,[1] and that as respects infant female children, when all else is equal, the welfare is usually best served by award to the mother.[2] But appellant argues that all things are not equal in this case; that the evidence demonstrates the unfitness of the mother; that her denial of certain incidents also amounted to perjury, and that, as we agree, perjury itself demonstrates unfitness and should never be rewarded by favorable decree.[3]
The trouble with defendant's contentions is that they ignore the obvious conclusions upon the facts by the trial court. If the whole evidence demonstrates unfitness and perjury on the part of the plaintiff, then it is our duty to correct what would be a legal mistake and reverse the award. In cases such as this it is our duty to review the whole evidence, reach our own conclusions, and render such judgment as we find should be given.[4] But here there are sharp questions of fact, charges and denials, counter-charges and counter-denials. Obviously both charges and denials cannot be true, and obviously there has been perjury. But who is telling the truth? The evidence is such that the court could have believed one of the parties and disbelieved the other, or it could have disbelieved both of them.
The situation we think calls for the application of the rule of deference; that is, absent something in the record which indicates that the trial court has proceeded under an erroneous conception of the law, or that it has ignored or refused to consider vital evidence, or that the great weight and force of the evidence is contrary to its conclusions, then we defer to the judgment of the trial court in a decision which is reached only by evaluating the credibility of the witnesses.[5] This rule is not an artificial one created simply to divide responsibility. The reason lies in the fact that the trial court sees and appraises the witnesses in person. Before him are all of the nuances, the thousand and one things which speak only to the ear and eye.[6] Truth in a courtroom is a vibrant, moving, beckoning thing, frequently whispering, occasionally shouting, and sometimes silently signaling. But truth *468 pressed in by the cold sheets of a sterile record may become a palid, shapeless thing, sometimes indistinct because covered by a blanket of printed contradictions. We defer to the judgment of the trial court in respect to credibility simply because he is in a better position to judge it.
Furthermore, the court in situations such as this is often confronted with a difficult choice, not always between black and white but often between different shades of gray. In considering the welfare of the children a choice must be made, not just as to who bears the lighter shade of gray but often as to which is the lesser of the two evils in respect to the future of the children. In this case there is certainly evidence which gave no credit to either of the contesting parties. There was also evidence from which the court could have well believed that neither the paternal nor the maternal grandparents were qualified to assume the burden of rearing three little girls, and in fact none of the grandparents tendered themselves as willing to accept this burden. The court having obviously judged the credibility of the witnesses and, from that, having made its determination as to where the welfare of the children would be best promoted, we think the rule of deference requires the affirmance of its judgment in this respect.
New trial on newly discovered evidence: It is contended that defendant's motion for new trial should have been sustained because of newly discovered evidence. Judgment was rendered on December 3. In due time defendant filed motion for new trial. On January 2, 1958, the court amended its judgment by including therein an order for custody in plaintiff pending possible appeal.[7] On the same day defendant filed his amended motion for judgment or, in the alternative, for a new trial. This motion stated that since the entering of the December 3rd decree defendant had discovered new evidence "which conclusively proves" that plaintiff has, since the date of decree, continuously associated with other men in a manner that is degrading, et cetera. This motion was overruled on the day of its filing.
The motion did not purport to set forth any of the facts concerning the evidence which it alleged had been newly discovered, nor did it offer the names of witnesses by whom said facts could be proved. It was verified by defendant's attorney but was not supported by any affidavit of witness or by any document, nor was reference made to any supporting proof. Neither does the record show any request for permission to file supporting affidavits at a later time. On January 10, eight days after the motion was overruled, defendant filed in the office of the clerk the affidavits of two private investigators who had been employed by defendant's attorney. These affidavits recited facts to the effect that through the night of January 5 they watched the premises occupied by plaintiff; that a car was parked at the rear of said premises, the title to which they traced to a man, one P.; that no one entered or left the premises until morning, and that in the morning a man came out of the house and took one of the little girls to school. (Note that the incident mentioned in the affidavits allegedly occurred after the amended motion for new trial had been filed.)
The courts have cast a rather jaundiced eye at motions for new trial on the ground of newly discovered evidence. While they are recognized as an occasionally necessary part of the procedure, they are treated with aversion rather than favor.[8] They are examined with caution and construed with "remarkable strictness."[9] *469 Their ruling is held to be largely within the sound discretion of the trial judge, whose judgment thereon will not be overruled unless it appears to have been a manifest abuse of such discretion.[10]
Before a party has a right to call upon the discretion of the court in this respect he must have brought himself strictly within the requirements which have been laid down for such a motion. Two of these requirements are (a) that it must set forth the newly discovered evidence, and the names of the witnesses, with sufficient detail so that the court may be able to judge whether it is competent, material, not cumulative, and whether it will probably produce a different result if a new trial is granted; and (b) it must be supported or accompanied by some proof, so that the examining court will not be led into the granting of a new trial upon vague assertions which may rest upon imagination, hope, misjudgment or intentional misrepresentation, also so that the opposite party may have opportunity to offer counter-proof.[11] In George v. Kansas City American Association Baseball Co., Mo.App., 219 S.W. 134, an almost identical situation was involved, and it was said, loc. cit. 135:
"The court was clearly without power to grant a new trial on the ground assigned. The motion for a new trial failed to set out the evidence which defendant alleged it had discovered since the trial, nor did it refer to any affidavit containing any such facts; it was not accompanied by any affidavit in support thereof, nor was the absence of any such affidavit accounted for."
We cannot convict the trial court of error in overruling the motion which was presented.
In one respect, however, we believe the decree should be modified. The judgment awarded support for the children, to be paid weekly commencing December 7, 1957. Thereafter defendant appealed, and it appears from subsequent proceedings that defendant filed supersedeas bond and retained actual custody of the children. It would be unjust to affirm the judgment, which on its face carries an accumulated installment obligation for support during the appeal period in which the plaintiff has not had actual custody and has not furnished such support, and the defendant has in fact contributed it. The judgment is modified so that the commencement date of the payments shall be the first Saturday after this judgment shall become final and enforceable and, as so modified, is affirmed.
After appeal, plaintiff filed motion for attorney's fees and suit money, and on hearing the court allowed the plaintiff the sum of $450 attorney's fees and $100 suit money.
At hearing of this motion defendant sought and offered to prove "that the plaintiff has continuously improperly associated with other men in a way and manner that conclusively demonstrates that she is not a fit and proper person to have the current custody of the children; and further that such has happened before and since the court's decree and amended decree." The offer was supported by the filing of the affidavits made by the two investigators which have been mentioned in the opinion on the main case. The purpose of the offer was stated to be "with honest belief *470 that the appeal is not well taken" and to show "that said appeal is not based on any reasonable grounds and merit." We will not take the appellant at his own word in this regard but will consider, as we gather from his brief, that his real contention was and is that respondent was not in good faith in resisting the appeal.
The motion for suit money and attorney's fees, while incidental and ancillary to the main case, is an independent proceeding,[12] and in determining such motion the court does not and cannot go into the merits of the principal controversy.[13] Ordinarily the morals of the parties, while a factor to be considered in determining the merits of the motion to modify, are not of concern to the court in determining an ancillary motion having to do simply with the determination of a money question.[14] And while it is said that the applicant for money with which to prosecute her suit must be "in good faith,"[15] it has frequently been held that a wife, "guilty or innocent," is entitled to the means by which to prosecute her action or defend herself.[16] The final judgment is substantiation of the fact that she had a meritorious case.[17]
We think it neither advisable nor necessary to attempt any exposition of the subject of good faith other than to say that, as applied to the situation here, it must appear that the wife expects to continue with her defense to a final determination and the motion is not presented simply and only for the purpose of getting money from the husband.[18] It so appears. We assume that appellant's contention in this regard has been made "in good faith," but we overrule it.
As to the amount: Plaintiff testitified to take-home income of approximately $173 per month. She listed debts (excluding attorney's fees) in approximate total of $340, the principal item of which is a $200 loan on which she is paying $25 per month.
The defendant had a total take-home income of approximately $373 per month, based on his withholding tax statement of the year before. He listed debts (attorney's fees not included) totaling $1495, with required payments of at least $104 per month. He also showed necessity of some car and tool expense in his work. We assume the expense for support of his present household, during the interim of this appeal, includes his present wife, a newly born baby of that marriage, and the children of the marriage involved in this case. During this interim, and until final disposition of this case, he has and has had the expense of care, support, schooling, and medical treatment of these children. If we apply the same yardstick of the amount of support necessary for these involved children as was fixed in the decree of court in the main case,[19] the cost of their support is $44 per week, or approximately $190 per month.[20] If we add the amount of *471 fixed payments on indebtedness ($104) to the amount necessary to support the children, we have a total of $294. Defendant is thus left with a very small amount with which to pay work and car expense and to support himself, his present wife, and the child of such marriage, an amount less than plaintiff testified was required to pay her, single, living expense. Neither party appears to have assets in any appreciable amount from which money can be realized.
While we agree that the amount fixed for attorney's fees ($450) and the amount of suit money ($100) is reasonable, it seems to us that under the circumstances with which we are confronted the allowance of such amount has placed an unreasonable burden upon the defendant and that a portion of such expense reasonably can be assumed and paid for by the plaintiff. The idea in requiring the husband to contribute attorney's fees and suit expense is not that he shall be punished for taking an appeal, but that the interests of the wife and children will be protected.[21] But in fixing the amount we should not render the husband incapable of supporting the child of the second marriage. The discretion to allow and fix suit money and attorney's fees is to be exercised in the light of the wife's necessities and the husband's ability to pay.[22] The question thus becomes a compromise of necessities and between the ability to pay on both sides. We think a fair compromise between necessities and abilities in this case would be that plaintiff's attorney's fees and suit money be halved, and the judgment is therefore modified by allowing the plaintiff $225 for attorney's fees and $50 for suit money, and as so modified it is affirmed.
STONE, P. J., and McDOWELL, J., concur.
NOTES
[1] McKenzie v. McKenzie, Mo.App., 306 S.W.2d 588, 591; Lewis v. Lewis, Mo.App., 301 S.W.2d 861.
[2] Long v. Long, Mo.App., 280 S.W.2d 690, 694; Edwards v. Edwards, Mo.App., 302 S.W.2d 37.
[3] S_____ v. G_____, Mo.App., 298 S.W.2d 67, 77; Shepard v. Shepard, Mo.App., 194 S.W.2d 319, 328.
[4] Graves v. Wooden, Mo.App., 291 S.W.2d 665; Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 75; Wilson v. Wilson, Mo.App., 260 S.W.2d 770.
[5] White v. White, Mo.App., 312 S.W.2d 167, 169; Clark v. Clark, Mo.App., 306 S.W.2d 641; Schneider v. Schneider, Mo.App., 293 S.W.2d 157, 163; Hensley v. Lake, Mo.App., 274 S.W.2d 493, 494; Cherry v. Cherry, Mo.App., 272 S.W.2d 700, 703; Smith v. Smith, Mo.App., 267 S.W.2d 704; Mayo v. Mayo, Mo.App., 244 S.W.2d 415; Lambert v. Lambert, Mo.App., 222 S.W.2d 544.
[6] Creamer v. Bivert, 214 Mo. 473, 113 S.W. 1118, 1120-1121; see Donati v. Gualdoni, 358 Mo. 667, 216 S.W.2d 519, 522; Zerega v. Zerega, Mo.App., 200 S.W. 700, 701.
[7] Apparently no effort was made to enforce this part of the judgment. Supersedeas bond was given, and it appears by later proceedings that defendant actually retained custody. It is not attacked on appeal, and it would appear that that question is now moot.
[8] McClellan v. Kansas City Public Service Co., Mo.App., 19 S.W.2d 902; Gromowsky v. Ingersol, Mo.App., 241 S.W.2d 60, 64; In re Priest's Estate, Mo.App., 227 S.W.2d 474.
[9] Gerth v. Christy, Mo.App., 231 S.W. 639; Van Meter v. Beckers, Mo.App., 42 S.W.2d 951.
[10] Devine v. Wells, 300 Mo. 177, 254 S.W. 65; Deacon v. City of Ladue, Mo.App., 294 S.W.2d 616; Foerstel v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 792.
[11] King v. Gilson, 206 Mo. 264, 104 S.W. 52; Young v. Levine, 326 Mo. 593, 31 S.W.2d 978, 983; George v. Kansas City American Association Baseball Co., Mo.App., 219 S.W. 134; see Winn v. Grier, 217 Mo. 420, 117 S.W. 48, 60; see Lyons v. Metropolitan Street Railway Co., 253 Mo. 143, 161 S.W. 726, 731.
[12] Carrow v. Carrow, Mo.App., 294 S.W.2d 595; Price v. Price, Mo.App., 281 S.W.2d 307, 313.
[13] Noll v. Noll, Mo.App., 286 S.W.2d 58; Brinker v. Brinker, 360 Mo. 212, 227 S.W.2d 724; Remley v. Remley, Mo.App., 208 S.W.2d 815.
[14] See Link v. Link, Mo.App., 262 S.W.2d 318.
[15] Price v. Price, Mo.App., 281 S.W.2d 307, 313; Downing v. Downing, Mo.App., 279 S.W.2d 538.
[16] Burtrum v. Burtrum, Mo.App., 200 S.W.2d 80; Gregg v. Gregg, Mo.App., 272 S.W.2d 855; Zerega v. Zerega, Mo.App., 200 S.W. 700.
[17] Farley v. Farley, Mo.App., 181 S.W.2d 671(5).
[18] See Downing v. Downing, Mo.App., 279 S.W.2d 538; see Adams v. Adams, 49 Mo.App. 592.
[19] See the comparison of living costs made in Burtrum v. Burtrum, Mo.App., 200 S.W.2d 80, 82; see Arndt v. Arndt, 177 Mo.App. 420, 163 S.W. 282, 284; White v. White, Mo.App., 313 S.W.2d 72.
[20] If the amount of $190 which we credit in this instance for necessary support for the children is too high, then the award of this amount in the principal case, which plaintiff will shortly be drawing, is too high and should be reduced.
[21] I_____ v. B_____, Mo.App., 305 S.W.2d 713.
[22] Graves v. Wooden, Mo.App., 291 S.W.2d 665, and cases collected at loc. cit. 671; Hawkins v. Hawkins, Mo.App., 250 S.W.2d 817.